IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MONTICELLO WEALTH MANAGEMENT, LLC, a Texas limited liability company, | § § § § | Case No. 5:19-cv-01206 _____ |
| *Plaintiff*, | § § | COMPLAINT FOR: |
| v. | § § | 1. DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF FEDERALLY |
| BRENTON GRADY DURHAM, an individual, and MONTICELLO ASSOCIATES, INC., a Delaware corporation, | § § § § § | REGISTERED DESIGN MARK; and

2. DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF ALLEGED COMMON-LAW TRADEMARK RIGHTS |
| *Defendants*. | § § | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW Plaintiff, MONTICELLO WEALTH MANAGEMENT, LLC ("Plaintiff" or "MWM") and for its Complaint for Declaratory Judgment against Defendants, BENTON GRADY DURHAM ("Durham") and MONTICELLO ASSOCIATES, INC. ("MAI") (collectively with Durham, "Defendants"), states and alleges as follows:

**I.**
**NATURE OF THE ACTION**

1.      This is an action for declaratory judgment of non-infringement by Plaintiff MWM of (a) Defendants' alleged common-law trademark rights in and to the word MONTICELLO; and (b) Defendants' alleged trademark rights in and to the below-depicted design mark (the "'429 Design Mark") registered with the United States Patent and Trademark Office under United States Trademark Registration No. 1,774,429 (the "'429 Design Mark Registration") and covering "asset management consulting services" in International Class 36:

1



A true and correct copy of the Registration Certificate for the '429 Design Mark is attached as **Exhibit "A"**.

## II.
### THE PARTIES

2.      Plaintiff, Monticello Wealth Management, LLC, is a Texas limited liability company with its principal place of business at 1777 N.E. Loop 410, Suite 201, San Antonio, Texas 78217.

3.      Plaintiff provides investment portfolio and wealth management, financial consulting, trust and estate planning, family education and governance, private banking, accounting, taxation, oil, gas and mineral management, and charitable gifting services (collectively, the "Services") *exclusively* within the State of Texas.

4.      All pleadings, motions, discovery, and other matters related in whole or in part to the above-styled and numbered case, should be served upon Plaintiff's undersigned counsel of record, DuBois, Bryant & Campbell, LLP, 303 Colorado St., Suite 2300, Austin, Texas 78701.

5.      Defendant Brenton Grady Durham is an individual who may be served with process by serving him at his current residence located at 7 Polo Club Dr., Denver, Colorado 80209.

6.      Defendant Monticello Associates, Inc. is a foreign corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business at 1800 Larimer St., Suite 2100, Denver, Colorado 80202.  Defendant MAI does not have a registered agent for service of process in the State of Texas.  Defendant MAI may be served with process by delivering a copy of the Summons and of the Complaint for Declaratory Judgment to Defendant Durham, who is the President of Defendant MAI.

2

### III.
#### JURISDICTION AND VENUE

7.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and is brought to declare the rights of Plaintiff MWM to continue using its (a) MONTICELLO WEALTH MANAGEMENT trade name ("MWM Trade Name"), (b) MONTICELLO WEALTH MANAGEMENT service mark ("MWM Service Mark"), and (c) below-depicted design mark ("MWM Design Mark"), each in connection with its Services in the State of Texas:



8.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 in that (a) the matter to be litigated raises one or more federal questions, and (b) this is a "civil action arising under any Act of Congress relating to… trademarks."  This Court has subject matter jurisdiction over any claims that may arise under state law by virtue of this Court's pendent and ancillary jurisdiction.

9.     This action presents an actual case or controversy under Article III of the United States Constitution and serves a useful purpose in clarifying and settling the parties' respective trademark rights.

10.     As more fully set forth below, Defendants have explicitly threatened Plaintiff with a trademark infringement lawsuit if Plaintiff does not agree "to phase out its use of MONTICELLO no later than **October 15, 2019**."  *See* attached **Exhibit "B"** at p. 4 (a cease-and-desist letter dated October 1, 2019, from Defendants' counsel, Amanda N. Marston of Holland & Hart, LLP, to Plaintiff's counsel, William D. Wiese of DuBois, Bryant & Campbell, LLP) (emphasis in original).

11.     However, Plaintiff is presently using in connection with its Services in the State of Texas, and intends to continue using in connection with its Services in the State of Texas, the MWM Trade Name, MWM Service Mark, and MWM Design Mark, each of which Defendants contend infringe their alleged (a) rights under the '429 Design Mark Registration, and (b) common-law trademark rights in and to the word MONTICELLO.

12.     Plaintiff's MWM Trade Name, MWM Service Mark, and the design, configuration and appearance of Plaintiff's MWM Design Mark, are not fluid, but rather, substantially fixed with respect to their allegedly-infringing characteristics.

13.     Thus, the dispute between Plaintiff and Defendants is "definite and concrete, real and substantial, and admit[s] of specific relief through a decree of a conclusive character." *Vantage Trailers*, *Inc*. *v*. *Beal Corp*., 567 F.3d 745, 748 (5th Cir. 2009) (citing *MedImmune*, *Inc*. *v*. *Genentech*, *Inc*., 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed.2d 604 (2007) (citing *Aetna Life Ins*. *Co*. *v*. *Haworth*, 300 U.S. 227, 240-41, 57 S. Ct. 461, 81 L. Ed. 617 (1937))).[1]

14.     Plaintiff does not "seek an opinion advising what the law would be on a hypothetical set of facts." *Vantage Trailers*, 567 F.3d at 748 (citing *MedImmune*, 549 U.S. at 127, 127 S. Ct. 764). To the contrary, "'the facts alleged [in this Complaint], under all the circumstances, show

---

[1] See also, *Canales v. ALM Media*, *LLC*, No. A-12-CV-1036-LY, 2014 WL 2807677, at *3 (W.D. Tex. Jun. 20, 2014) ("Canales does not deny that he is continuing to use the mark on his websites nor does he dispute that he filed trademark applications in June and September of 2012. Thus, the controversy between ALM and Canales is sufficiently immediate, real, and definite to satisfy ALM's standing requirements under Article III. … Additionally, the Court finds the facts in *Vantage Trailers* distinguishable from the instant case. In *Vantage Trailers*, the Fifth Circuit held that there was no actual controversy between the parties because the design of the allegedly infringing product was not 'substantially fixed and definite' when the plaintiff filed its declaratory judgment action. 567 F.3d at 749. The product in question had not yet been produced. Under ALM's contentions in this case, the infringing activity—use of the 'SUPREMECOURTINSIDER' mark—has and continues to occur as Canales still uses the mark on his website. Thus, this is not a case where it is unclear whether the allegedly infringing activity would occur in the future. It has occurred and continues to occur.") (*Canales* case attached as **Exhibit "C"**).

that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id*. (citing *MedImmune*, 549 U.S. at 127, 127 S. Ct. 764 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co*., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941))).

15.     Defendants cannot contest this Court's personal jurisdiction, as Defendants insist that they have (a) "used the trademark MONTICELLO to offer [their] financial and investment advisory services *throughout the United States* continuously since 1992" [*see* attached **Exhibit "D"** at p. 1 (a cease-and-desist letter dated August 7, 2019, from Defendants' counsel, Amanda N. Marston, to Plaintiff MWM) (emphasis added)]; and (b) "several notable clients throughout the United States, *including Texas*" [*see* attached **Exhibit "B"** at p. 1 (emphasis added)].

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2) and (3), as this is the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," as well as a "judicial district in which any defendant is subject to the court's personal jurisdiction."

## IV.
### RELEVANT FACTS

### A.     Plaintiff's Uses of Its MWM Trade Name, MWM Service Mark, and MWM Design Mark, Do Not Infringe Defendants' Alleged Common-Law Trademark Rights in and to the Word MONTICELLO Because the Parties' Uses Were Confined to Geographically Separate Markets.

17.     Defendants' attorney, Amanda N. Marston, sent Plaintiff two cease-and desist letters, the first dated August 7, 2019 (a true and correct copy of which is attached as **Exhibit "D"**), and the second dated October 1, 2019 (a true and correct copy of which is attached as **Exhibit "B"**).

18.     In her August 7, 2019 cease-and-desist letter, Ms. Marston advised Plaintiff that Defendant MAI (a) is a "licensee" of Defendant Durham's alleged common-law trademark rights

in and to the word MONTICELLO; (b) "is an independent asset management consulting firm that provides investment advisory services;" (c) "has used the trademark MONTICELLO to offer its financial and investment advisory services *throughout the United States* continuously since 1992;" and (d) "recently learned from one of its clients,[2] who received a solicitation from [Plaintiff], that [Plaintiff] is using MONTICELLO and a remarkably similar logo in connection with offering its financial advisory and consulting services." *See* **Exhibit "D"** at p. 1.  Ms. Marston demanded, on behalf of Defendants Durham and MAI, that Plaintiff "immediately cease use of MONTICELLO an[d] confusingly similar terms or graphical elements in the course of offering [its] financial services and wealth planning or other related advisory services." *See id*.

19.     In her October 1, 2019 cease-and-desist letter, Ms. Marston again advised Plaintiff that (a) "[Defendant] Durham … licenses use of MONTICELLO/MONTICELLO ASSOCIATES to [Defendant MAI];" (b) "[Defendant MAI] uses MONTICELLO with and without ASSOCIATES in connection with its services and has done so for nearly thirty years, entitling it to broad common law rights in MONTICELLO;" and (c) "[Defendant MAI] … has several notable clients throughout the United States, *including Texas*." *See* **Exhibit "B"** (emphasis added).  Ms. Marston demanded, on behalf of Defendants Durham and MAI, that Plaintiff agree "no later than **October 15, 2019**," to "phase out its use of MONTICELLO," including its "use of the MONTICELLO WEALTH MANAGEMENT mark and affiliated logo." *See id* (emphasis in original).

20.     Defendant MAI is a "pension consultant with respect to assets of plans having an aggregate value of at least $200,000,000" and, thus, is required to register with the Securities and Exchange Commission ("SEC").

---

[2] The "client" of Defendant MAI, that Ms. Marston references in her August 7, 2019 cease-and-desist letter, is not a consumer of Defendants' investment advisory services, but rather, a third-party money manager.

21.     Just six (6) months ago, on April 5, 2019, Defendant MAI submitted to the SEC its Form ADV (i.e., "Uniform Application for Investment Adviser Registration and Report by Exempt Reporting Advisers"), a true and correct copy of which is attached as **Exhibit "E"**.

22.     On page 7 of that form, Defendant MAI was advised that:

> Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

23.     However, Defendant MAI did <u>not</u> check the box for the State of Texas:

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☑ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☐ TX ← |
| ☑ CA | ☐ KY | ☐ NM | ☐ UT |
| ☑ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☑ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☑ VA |
| ☐ DC | ☐ MA | ☑ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

24.     Even if Defendant MAI had no more than five (5) clients residing in Texas during the preceding twelve (12) month period, and, therefore, was exempt from registering with the Texas Securities Commissioner pursuant to Rule 116.1(b)(2)(A)(iv) of the Texas Administrative Code, Defendant MAI would still have been required—*if indeed, it had provided any investment advisory services to clients residing in Texas*—to designate Texas as a state to receive "notice filings." *See* Rule 116.1(b)(2)(C) of the Texas Administrative Code.

25.     Upon information and belief, Defendant MAI did not designate Texas as a state to receive "notice filings" because Defendant MAI does not provide any investment advisory services

7

within the State of Texas in connection with the alleged MONTICELLO common-law trademark purportedly owned and licensed to Defendant MAI by Defendant Durham.

26.     Further, Defendant MAI represented in its Form ADV, Part 2A Brochure that, "Neither [Defendant MAI] nor its employees is involved in any other financial industry activities…" [*See* attached **Exhibit "F"** at p. 5].

27.     The territorial scope of an unregistered mark, such as the alleged MONTICELLO common-law trademark purportedly owned and licensed to Defendant MAI by Defendant Durham, is limited to the territory in which the mark is known and recognized by those in the defined group of potential customers. *See*, *Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010) ("Geographic considerations are also particularly relevant where a plaintiff holds only common-law trademark rights in a mark because it is well-established that the scope of protection accorded his mark is coextensive only with the territory throughout which it is known and from which it has drawn its trade.") (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416, 36 S. Ct. 357, 60 L. Ed. 713 (1916), *superseded by statute in irrelevant part as stated in Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 105 S. Ct. 658, 83 L. Ed.2d 582 (1985)).

28.     Here, Defendants do not use the alleged MONTICELLO common-law trademark within the State of Texas, nor do Texas consumers identify asset management consulting services advertised or sold in connection with the name MONTICELLO as being performed by Defendants.

29.     Thus, any alleged common-law trademark rights in and to the word MONTICELLO that are purportedly owned by Defendant Durham, or licensed to Defendant MAI, do not extend into the State of Texas and, therefore, cannot be infringed by Plaintiff, who *exclusively* uses its MWM Trade Name, MWM Service Mark, and MWM Design Mark, within this State.

**B.**   **Plaintiff's Uses of Its MWM Trade Name, MWM Service Mark, and MWM Design Mark, Do Not Infringe Defendants' Alleged Trademark Rights in and to the Registered '429 Design Mark.**

1.   *Plaintiff's MWM Design Mark and Defendant Durham's '429 Design Mark are Not Confusingly Similar in Appearance*

30.   A quick side-by-side comparison of Plaintiff's MWM Design Mark and Defendant Durham's '429 Design Mark confirm that the trademarks are not confusingly similar in appearance:

| **Plaintiff's MWM Design Mark** | **Defendant Durham's '429 Design Mark** |
| :---: | :---: |
|  |  |

31.   There are marked differences between the two trademarks, including, among others, the fact that Plaintiff's MWM Design Mark has four distinct pillars extending underneath a building, a series of three arched windows in a row with a fourth window beneath, white lettering on a blue background, a different font, words positioned next to, and not under, the building, no distinct black lines separating any of the words in the logo, and the words "Wealth Management," as opposed to the word "Associates" that appears in Defendant Durham's '429 Design Mark.

32.   When viewed as a "whole" (as required by the anti-dissection rule, which prohibits a Court from breaking a composite trademark into its component parts, and from ignoring words contained within a composite trademark simply because those words are less dominant than other words contained therein), the overall commercial impression created by the two trademarks is entirely different.

33.   As a result, it is unreasonable for Defendants to assert that a consumer of asset management consulting services would confuse the source of the parties' respective services based

on any perceived similarities in the two trademarks.  Plaintiff's counsel advised Defendants as much in his August 16, 2019 response to Defendants' initial cease-and-desist letter [*see* **Exhibit "G"** at p. 2], but Defendants nevertheless continued to explicitly threaten Plaintiff with "litigation"—this despite the fact that ***Plaintiff has continuously used its MWM Trade Name, MWM Service Mark, and MWM Design Mark, for over nine (9) years without a single reported instance of a consumer having confused Plaintiff for Defendant MAI.***  The fact that the two companies have peacefully co-existed for years without any confusion is strong evidence of non-infringement, and there is no evidence to suggest that there will be any consumer confusion in the future.

34.     Moreover, Defendants' demand that Plaintiff stop using its MWM Trade Name and MWM Service Mark far exceeds any trademark rights Defendants may have under the '429 Design Mark Registration.  Defendants have asserted that Defendant Durham's registration of a logo that includes the words "Monticello Associates" gives Defendants the right to stop Plaintiff from using the words "Monticello Wealth Management."  However, when determining whether infringement has occurred, each mark must be viewed as a whole and not broken into its component parts.  Under the anti-dissection rule, words in composite marks, like Defendant Durham's '429 Design Mark, cannot be ignored simply because they are less dominant.  It is the impression that the mark as a whole creates on the average reasonably prudent buyer that determines infringement, and not the impression made by any individual word in the mark.  Therefore, while Defendants may have the right to stop others from using the composite mark with a design that includes the words "Monticello Associates" as a whole, that right does not extend to the word "Monticello" when used alone or in combination with a logo.

2.      *Defendants Failed to Police the '429 Design Mark Thereby Weakening or Eliminating Any Trademark Rights They Might Otherwise Have Possessed by Reason of the '429 Design Mark Registration*

35.     The law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers. If the trademark owner is acquiescent and tolerates the encroachment of infringers, it will find that its trademark asset has "eroded" and "shrunken" because the strength of its mark as a distinctive and distinguishing symbol has been diminished by the presence of similar marks.  2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:91 (5th ed.).

36.     There are a number of other companies using the word MONTICELLO in connection with financial services, including, without limitation, Monticello Consulting Group—a company that Defendants have admitted "operate[s] in a similar financial space as [Plaintiff] and [Defendant MAI]" and that Defendants have described as "another problematic user" of their alleged common-law MONTICELLO trademark.  *See* **Exhibit "B"** at p. 2; *see also*, Monticello Consulting Group's website at https://www.monticellocg.com/financial-services-industry/.

37.     This means that Defendants' alleged common-law trademark rights in and to the word MONTICELLO are, at best, extremely weak and entitled to the narrowest scope of protection.

3.      *The '429 Design Mark Registration Does Not Give Defendants the Right to Enjoin Plaintiff's Use of the MWM Trade Name, MWM Service Mark and/or MWM Design Mark*

38.     In cases where the senior user has obtained a federal trademark registration, the *Dawn Donut* rule holds that "while a senior federal registrant has superior priority, there is no likely confusion for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory."  *See e.g.*, *Dawn Donut v. Hart's Food Stores*, 267 F.2d 358, 364, 121 U.S.P.Q. 430 (2nd Cir. 1959) ("if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood

that the registrant will expand his use into [the unauthorized user's] market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark"); *Cross Trailers*, *Inc*. *v*. *Cross Trailer Mfg*. *& Sales*, *LLC*, 363 F. Supp.3d 774, 782-83 (W.D. Tex. 2018) (acknowledging that "the Fifth Circuit's express acceptance of *Dawn Donut* binds this Court," that "*Dawn Donut* is still good law in this Circuit," and "that *Dawn Donut* can be dispositive" of an trademark owner's claim of alleged trademark infringement).

39.     Given that Plaintiff targets consumers *exclusively* within the State of Texas, and that Defendants have not even alleged, much less substantiated, any intent to expand use of their '429 Design Mark in connection with their investment advisory services into this State,[3] there can be no likelihood of consumer confusion caused by the parties' concurrent uses of their respective trademarks, even if those trademarks were confusingly similar in appearance, which they are not in this case.

### 4.     *Defendants' Explicit Threats to Sue Plaintiff*

40.     In her initial August 7, 2019 cease-and-desist letter to Plaintiff, Defendants' counsel, Amanda N. Marston, explicitly threatened Plaintiff with "further action" should Plaintiff not immediately cease all uses of the word MONTICELLO in connection with its Services, a threat that far exceeds any of Defendants' alleged (a) common-law trademark rights in and to the word MONTICELLO, and (b) trademark rights under the '429 Design Mark Registration:

---

[3] Plaintiff's counsel, William D. Wiese, explicitly stated in his August 16, 2019 response to Defendants' August 7, 2019 cease-and-desist letter: "If you have information you believe would be relevant to your demands, such as evidence of actual confusion between the two marks or your client's intention to enter the Texas market, I ask that you send it to me so that I can review it with our client. Otherwise, we will consider this matter closed." [*See* attached **Exhibit "G"** at p. 3]. To date, Defendants have produced no such information to Plaintiffs.

Because Jefferson is using MONTICELLO to offer wealth management services to Monticello's customers, Monticello is understandably concerned about current and future consumer confusion. Accordingly, Monticello demands that you immediately cease use of MONTICELLO any confusingly similar terms or graphical elements in the course of offering your financial services and wealth planning or other related advisory services.

Monticello is hopeful this matter can be amicably resolved without the need for further action. We therefore look forward to your confirmation on or before August 20, 2019. In the meantime, please feel free to contact me, or have your counsel contact me.

Sincerely,

Amanda M.

Amanda N. Marston
for Holland & Hart LLP

41.    Defendants' threats against Plaintiff did not end with Ms. Marston's August 7, 2019 cease-and-desist letter. Rather, Plaintiff's counsel, William D. Wiese, received a second cease-and-decease letter from Ms. Marston dated October 1, 2019 [**Exhibit "B"**].

42.    In that second cease-and-desist letter, Ms. Marston (a) explicitly accused Plaintiff of "infring[ing Defendants'] trademark rights"; (b) "reiterate[d Defendants'] demand that [Plaintiff] cease use of the MONTICELLO WEALTH MANAGEMENT mark and affiliated logo"; and (c) in no uncertain terms, threatened to sue Plaintiff for trademark infringement should Plaintiff not agree, on or before October 15, 2019, to phase out its use of MONTICELLO, including, without limitation, its use of the MWM Trade Name, MWM Service Mark, and MWM Design Mark:

Given the overlap in client base, which is only going to increase over time as your client or Monticello, or both, continue to expand their market reach, we would assume your client would want to adopt a mark that did not pose the likelihood of confusion that exists here. At this time, Monticello is willing to afford your client a reasonable phase-out period during which it can transition to a new mark without significant disruption, which is an outcome that will not exist if we are forced into litigation. If we are to avoid litigation in this matter, we require receipt of your client's agreement to phase out its use of MONTICELLO no later than **October 15, 2019**.

Sincerely,

Amanda M.

Amanda N. Marston
for Holland & Hart LLP

3062630.2

5. *Defendant MAI Does Not Have Standing to Sue Plaintiff for Any Alleged Infringement of the '429 Design Mark and/or the Alleged Common-Law MONTICELLO Trademark*

43.     Defendants have admitted that "Mr. Durham is the owner of record who licenses use of MONTICELLO/MONTICELLO ASSOCIATES to [Defendant MAI]."  [**Exhibit "B"** at p. 2]. Defendants have also alleged that they "collectively" use both the registered '429 Design Mark and the purported MONTICELLO common-law mark.  However, to have standing to sue a purported infringer for infringement of the registered '429 Design Mark and/or the purported MONTICELLO common-law mark, Defendant MAI would have to be the registrant, assignee, or exclusive licensee of that trademark, possessing the right to exclude even Defendant Durham's concurrent use of that trademark.  *ICEE Distrib*., *Inc*. *v*. *J&J Snack Foods Corp*., 325 F.3d 586, 598 (5th Cir. 2003) (citing *Finance Inv*. *Co*. *(Bermuda) Ltd*. *v*. *Geberit AG*, 165 F.3d 526, 532 (7th Cir. 1998)).

### V.
### CAUSES OF ACTION

### Count I - Declaratory Judgment of Non-Infringement
### of the '429 Design Mark

44.     Plaintiff MWM incorporates by this reference all the preceding paragraphs of this Complaint for Declaratory Judgment as if fully realleged and restated herein.

45.     Defendants have claimed that Plaintiff's use of its MWM Trade Name, MWM Service Mark, and MWM Design Mark, in connection with its Services in the State of Texas, infringes on the '429 Design Mark owned by Defendant Durham, and purportedly licensed by Defendant Durham to Defendant MAI.

46.     Defendants have demanded that Plaintiff cease and desist from using the MWM Trade Name, MWM Service Mark, and MWM Design Mark, in association with the marketing or selling of asset management consulting services, or face "further action," including "litigation."

14

These claims and demands were transmitted to Plaintiff by cease-and-desist letters dated August 7, 2019 and October 1, 2019.

47.     Plaintiff is presently using in connection with its Services in the State of Texas, and intends to continue using in connection with its Services in the State of Texas, each of the MWM Trade Name, MWM Service Mark, and MWM Design Mark, that Defendants contend infringe their rights under the '429 Design Mark Registration.

48.     Plaintiff's MWM Trade Name, MWM Service Mark, and the design, configuration and appearance of Plaintiff's MWM Design Mark, are not fluid, but rather, substantially fixed with respect to their allegedly-infringing characteristics.

49.     A substantial, immediate and justiciable controversy has arisen between the parties concerning Plaintiff's right to use its MWM Trade Name, MWM Service Mark, and MWM Design Mark, in connection with its Services in the State of Texas.

50.     Plaintiff seeks a declaratory judgment from this Court that it is not infringing or diluting, has not infringed or diluted, and will not infringe or dilute through its continued use of its MWM Trade Name, MWM Service Mark and/or MWM Design Mark within the State of Texas, any rights Defendants may have under the '429 Design Mark Registration; that Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and MWM Design Mark within the State of Texas have not caused, and are not likely to cause, any confusion, mistake or deception as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval by Defendants of Plaintiff's Services; and that Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and MWM Design Mark within the State of Texas have not subjected Defendants to any unfair competition.

**Count II - Declaratory Judgment of Non-Infringement
of Defendants' Alleged Common-Law Trademark Rights
In and To the Word MONTICELLO**

51.     Plaintiff MWM incorporates by this reference all the preceding paragraphs of this Complaint for Declaratory Judgment as if fully realleged and restated herein.

52.     Defendants have claimed that Plaintiff's use in connection with Plaintiff's Services of the MWM Trade Name, MWM Service Mark, and MWM Design Mark, infringes their alleged common-law trademark rights in and to the word MONTICELLO.  Defendants have demanded that Plaintiff cease and desist from using the word MONTICELLO in association with the marketing or selling of asset management consulting services, or face "further action," including "litigation." These claims and demands were transmitted to Plaintiff by cease-and-desist letters dated August 7, 2019 and October 1, 2019.

53.     Plaintiff is presently using in connection with its Services in the State of Texas, and intends to continue using in connection with its Services in the State of Texas, each of the MWM Trade Name, MWM Service Mark, and MWM Design Mark, that Defendants contend infringe their common-law trademark rights in and to the word MONTICELLO.

54.     Plaintiff's MWM Trade Name, MWM Service Mark, and the design, configuration and appearance of Plaintiff's MWM Design Mark, are not fluid, but rather, substantially fixed with respect to their allegedly-infringing characteristics.

55.     A substantial, immediate and justiciable controversy has arisen between the parties concerning Plaintiff's right to use its MWM Trade Name, MWM Service Mark, and MWM Design Mark, in connection with its Services in the State of Texas.

56.     Plaintiff seeks a declaratory judgment from this Court that it is not infringing or diluting, has not infringed or diluted, and will not infringe or dilute through its continued use of its

MWM Trade Name, MWM Service Mark and/or MWM Design Mark within the State of Texas,

any common-law trademark rights that Defendants may possess in and to the word MONTICELLO;

that Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and

MWM Design Mark within the State of Texas have not caused, and are not likely to cause, any

confusion, mistake or deception as to the affiliation, connection, or association of Defendants with

Plaintiff, or as to the origin, sponsorship, or approval by Defendants of Plaintiff's Services; and that

Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and MWM

Design Mark within the State of Texas have not subjected Defendants to any unfair competition.

## VI.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment awarding it the following relief:

(a) An order declaring that Plaintiff is not infringing or diluting, has not infringed or diluted, and will not infringe or dilute through its continued use of its MWM Trade Name, MWM Service Mark and/or MWM Design Mark within the State of Texas, any rights Defendants may have under the '429 Design Mark Registration;

(b) An order declaring that Plaintiff is not infringing or diluting, has not infringed or diluted, and will not infringe or dilute through its continued use of its MWM Trade Name, MWM Service Mark and/or MWM Design Mark within the State of Texas, any common-law trademark rights that Defendants may possess in and to the word MONTICELLO;

(c) An order declaring that Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and MWM Design Mark within the State of Texas have not caused, and are not likely to cause, any confusion, mistake or deception as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval by Defendants of Plaintiff's Services;

(d) An order declaring that Plaintiff's past, present and future uses of its MWM Trade Name, MWM Service Mark, and MWM Design Mark within the State of Texas have not subjected Defendants to any unfair competition;

(e) An order awarding Plaintiff its reasonable and necessary attorneys' fees, costs and expenses incurred in connection with this action; and

(f) An order awarding such other and further relief to which Plaintiff may show itself justly entitled.

Respectfully submitted,

DuBOIS, BRYANT & CAMPBELL, LLP
303 Colorado Street, Suite 2300
Austin, TX  78701
(512) 457-8000
(512) 457-8008 (Facsimile)

By: */s/ William S. Rhea*
      William S. Rhea
      State Bar No. 16807100
      brhea@dbcllp.com

      *ATTORNEYS FOR PLAINTIFF*

3062630.2

# EXHIBIT A

Int. Cl.: 36

Prior U.S. Cls.: 101 and 102

**United States Patent and Trademark Office**

Reg. No. 1,774,429
Registered June 1, 1993

## SERVICE MARK
### PRINCIPAL REGISTER



DURHAM, B. GRADY (UNITED STATES CITI-
ZEN)
MONTICELLO ASSOCIATES
1700 BROADWAY, SUITE 320
DENVER, CO 80290

FOR: ASSET MANAGEMENT CONSULTING
SERVICES, IN CLASS 36 (U.S. CLS. 101 AND
102).

FIRST USE 8–18–1992; IN COMMERCE
8–18–1992.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "ASSOCIATES" , APART
FROM THE MARK AS SHOWN.

SER. NO. 74–313,018, FILED 9–9–1992.

ESTHER A. BORSUK, EXAMINING ATTOR-
NEY

# EXHIBIT B



**HOLLAND & HART** LLP

Amanda N. Marston
**Phone** (303) 473-2712
anmarston@hollandhart.com
34040.0001

October 1, 2019

**By Email: bwiese@dbcllp.com**

Mr. Bill Wiese
DuBois Bryant & Campbell
303 Colorado, Suite 2300
Austin, Texas 78701

      **Re:**      **Unauthorized Use of MONTICELLO Marks**

Mr. Wiese:

      We are in receipt of your response to our demand letter and have reviewed the various arguments you submitted in response. As set forth in more detail below, we are unpersuaded by your arguments and reiterate our demand that your client cease use of the MONTICELLO WEALTH MANAGEMENT mark and affiliated logo.

- *Geographic scope*: You assert that Monticello is not doing business in Texas and that, since your client's scope is limited to San Antonio, Monticello exceeds its trademark rights. This assertion is factually incorrect. Monticello not only has several notable clients throughout the United States, including Texas, it was your client's *solicitation* of Monticello's clients that brought your client's use of MONTICELLO WEALTH MANAGEMENT to Monticello's attention. The fact that your client is now soliciting Monticello's clients, using a confusingly similar trademark and logo, (1) defeats your attempt to geographically delineate the parties' respective uses, (2) shows that actual confusion is now occurring in the market, and (3) indicates that your client has expanded its infringing use to now include Monticello's client base, which is further illustrated by the fact that your client's website at MONTICELLOWEALTH.COM was still "coming soon" until late 2017.

- *Confusing similarity of the marks*: As an initial matter, the standard for determining whether two marks are confusingly similar is not a side-by-side comparison. A likelihood of confusion analysis looks at the market realities and the ways in which consumers encounter the marks. The minute distinctions you point to are insignificant and do little to alleviate the confusion that will result when a client is exposed to the parties' respective marks at different times, which is the likely real-world experience. Your client's use of "wealth management," which is placed in the exact same position as Monticello's "associates" element, is descriptive of your client's services, and does not serve to distinguish the

T 303.473.2700    F 303.473.2720
One Boulder Plaza, 1800 Broadway, Suite 300
Boulder, CO 80302-5289
www.hollandhart.com

| Alaska | Montana | Utah |
| Colorado | Nevada | Washington, D.C. |
| Idaho | New Mexico | Wyoming |



identical, dominant MONTICELLO portion of the marks.  Further, your client's use of the image of Thomas Jefferson's Monticello home pulls your mark closer to Monticello's mark, as most consumers will see MONTICELLO paired with the image of a colonial home and affiliate the confusingly similar marks.  Your attempt to distinguish the logos by pointing to the number of pillars in the depicted houses is strained.

- *Ownership*:  You question the ownership of the MONTICELLO marks, noting that Mr. Durham is the owner of record who licenses use of MONTICELLO/MONTICELLO ASSOCIATES to Monticello.  As you surely can confirm through your research, Mr. Durham is in fact the owner of Monticello, and your concern for his business decisions regarding the ownership of a trademark registration that he has owned for nearly thirty years does not change the validity of the business decision.  This fact has no bearing on your client's infringement of the MONTICELLO marks.

- *Third-party marks*:  First, Monticello would like to thank you for bringing MONTICELLO CONSULTING GROUP to our attention.  Because they operate in a similar financial space as your client and Monticello, we will contact them shortly regarding their use.  As for MONTICELLO FINANCE and MONTICELLO BANKING COMPANY, we assume you noticed that these marks are both used in connection with businesses based in Monticello, Mississippi and Monticello, Kentucky, respectively, and Monticello is therefore geographically descriptive of those uses.  Further, a quick investigation shows that one business deals specifically in installment loans and the other is a bank whose investment services do not appear to extend beyond savings accounts and IRAs.

If your client's services similarly were limited to installment loans and IRAs in Monticello, Kentucky, we may be able to discuss a coexistence.  However, your client offers investment management, advisory consulting services, education and governance services for "affluent families," trust services, private banking, oil and gas mineral rights management, and charitable gifting, among other services.  Many of these services are identical or closely related to the services provided by Monticello.

Although we appreciate that you have identified another problematic user of MONTICELLO, two geographically descriptive marks on services more distinct than your client's does not narrow our client's scope of rights.  Even if Monticello's rights were narrower, your client's highly similar mark and related goods would still infringe our client's trademark rights.

| Alaska | Montana | Utah |
| Colorado | Nevada | Washington, D.C. |
| Idaho | New Mexico | Wyoming |

www.hollandhart.com



- *Scope of enforcement*: Your assertion that our client's enforcement strategy exceeds its scope of rights illustrates a misunderstanding of trademark law. First, in the United States, rights arise out of use not registration. Second, the standard for trademark infringement is a likelihood of confusion, which exists here. The assertion that our client can only enforce against marks identical to its federally-registered mark is untrue. Our client uses MONTICELLO with and without ASSOCIATES in connection with its services and has done so for nearly thirty years, entitling it to broad common law rights in MONTICELLO. Even if Monticello did not have a federal registration at all, its valuable common law rights are sufficient to enforce against infringers. And, as stated above, the dominant portion of both marks, MONTICELLO, is identical, and any descriptive additions ("wealth management" vs. "associates") do nothing to distinguish the marks as a whole.

- *Dawn Donut*: As discussed above, our clients are clearly not geographically distinct given the fact that your client has directly solicited Monticello's clients. The principle in *Dawn Donut v. Hart's Food Stores,* the validity of which has been questioned by courts and commentators due to the age of that case, states that "if the use of the marks by the registrant and the unauthorized user are *confined* to geographically separate markets with *no likelihood that the registrant will expand his use into the defendant's market* then the registrant is not entitled to enjoin the junior user's use of the mark." 267 F.2d 358, 364, 121 U.S.P.Q. 430 (2d Cir. 1959) (emphasis added). Moreover, the *Dawn Donut* court held that "if such expansion were probable, then the concurrent use of the marks would give rise to the conclusion that there was a likelihood of confusion." *Id.* Clearly, your client and Monticello are operating in the same markets given your client's solicitations to Monticello's clients, and the overlap of consumers shows that not only is expansion likely, but it has already occurred.

Alaska        Montana       Utah
Colorado      Nevada        Washington, D.C.
Idaho         New Mexico    Wyoming



Mr. Bill Wiese
October 1, 2019
Page 4

Given the overlap in client base, which is only going to increase over time as your client or Monticello, or both, continue to expand their market reach, we would assume your client would want to adopt a mark that did not pose the likelihood of confusion that exists here.  At this time, Monticello is willing to afford your client a reasonable phase-out period during which it can transition to a new mark without significant disruption, which is an outcome that will not exist if we are forced into litigation.  If we are to avoid litigation in this matter, we require receipt of your client's agreement to phase out its use of MONTICELLO no later than **October 15, 2019**.

Sincerely,

Amanda N. Marston
for Holland & Hart LLP

cc:   Scott Havlick, Esq.
        Timothy Getzoff, Esq.

13598243

Alaska         Montana        Utah
Colorado     Nevada          Washington, D.C.
Idaho          New Mexico   Wyoming

www.hollandhart.com

# EXHIBIT C

2014 WL 2807677

2014 WL 2807677
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
Austin Division.

Ramiro CANALES,
v.
ALM MEDIA, LLC, et al.

No. A–12–CV–1036–LY.
|
Signed June 20, 2014.

**Attorneys and Law Firms**

Ramiro Canales, Ramiro Canales, Esq., Austin, TX, for
Ramiro Canales.

Alicia Wagner Calzada, Haynes and Boone, LLP, San
Antonio, TX, Adam Hugh Sencenbaugh, Laura Lee
Prather, Haynes and Boone, LLP, Austin, TX, for Alm
Media, LLC, et al.

*REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE*

ANDREW W. AUSTIN, United States Magistrate Judge.

**\*1** TO: THE HONORABLE JUDGE LEE YEAKEL
UNITED STATES DISTRICT JUDGE
Before the Court are the following motions and their
associated responses and replies:
> (1) Plaintiff/Counter–Defendant's Second Motion to
> Dismiss Counterclaims and Affirmative Defenses
> (Dkt. No. 55);[1]

> (2) Plaintiff/Counter–Defendant's Third Motion to
> Dismiss Counterclaims and Affirmative Defenses
> (Dkt. No. 60).
> The District Court referred the motions to the
> undersigned Magistrate Judge for report and
> recommendation pursuant to 28 U.S.C. §

636(b)(1)(A), FED. R. CIV. P. 72, and Rule 1(c) of
Appendix C of the Local Rules. The Court held a
hearing on the motions on June 10, 2014.

**I. ANALYSIS**[2]

**A. Ramiro Canales's Second Motion to Dismiss
Defendants' Counterclaims and Affirmative Defenses
(Dkt. No. 55)**
In this motion, Plaintiff/Counter–Defendant Ramiro
Canales ("Canales") argues that the submission of his
Third Amended Complaint (Dkt. No. 53) before
Defendant/Counter–Plaintiffs ALM Media, LLC, and
ALM Media Properties, LLC (collectively "ALM"),
submitted their First Amended Answer and Counterclaims
to Canales's Second Amended Complaint (Dkt. No. 54)
requires the Court to dismiss ALM's filing. Canales
accuses ALM of attempting to "resurrect" the Second
Amended Complaint by filing its First Amended Answer
approximately thirty minutes after Canales had filed his
Third Amended Complaint. Dkt. No. 55 at 4. Canales also
charges ALM with "amateurish conduct" and failing to
"stop and think" before filing its First Amended Answer.
*Id.* at 4–5. In response, ALM contends that Canales's
arguments are meritless as ALM was permitted to file
supplemental pleadings by the Scheduling Order in this
case. Dkt. No. 58 at 2. Additionally, ALM notes that
Canales makes no discernible arguments under either
Rules 12(b)(1) or 12(b)(6) for why ALM's First Amended
Answer should be dismissed. *Id.* at 2–3.

After reviewing the parties' filings, the Court will
recommend that the District Judge **DENY** Canales's
motion. The record clearly demonstrates that the parties
were permitted to submit amended pleadings by January
31, 2014. Dkt. No. 36. Canales's assumption that ALM's
First Amended Answer was exclusively a response to his
Second Amended Complaint is misplaced. Additionally,
although Canales purports to move for dismissal of
ALM's First Amended Answer pursuant to Rules 12(b)(1)
and 12(b)(6), he has not articulated any reasoning for
dismissal based on these rules. There is no argument that
ALM has failed to state a claim or that the Court does not
have subject matter jurisdiction over ALM's
counterclaims. Instead, Canales's sole contention—one
that the Court finds to be without merit-appears to be that
because ALM's First Amended Answer was filed
approximately thirty minutes after Canales filed his Third
Amended Complaint, ALM's First Amended Answer
should be dismissed.[3] Moreover, ALM has timely filed an

**WESTLAW** © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

Original Answer and Counterclaims to Canales's Third Amended Complaint (Dkt. No. 56). Thus, any possible complaint Canales has with regard to ALM's Original Answer (Dkt. No. 52) or First Amended Answer (Dkt. No. 54) is moot. Accordingly, the Court recommends the Canales' Second Motion to Dismiss ALM's Counterclaims and Affirmative Defenses (Dkt. No. 55) be **DENIED.**

**B. Ramiro Canales's Third Motion to Dismiss Defendants' Counterclaims and Affirmative Defenses (Dkt. No. 60)**

**\*2** Canales's Third Motion to Dismiss asserts many of the same contentions that were raised in his initial motion to dismiss in March, 2013. In the instant motion, Canales argues that (1) there is no case or controversy in this suit that would sustain ALM's counterclaim under the Federal Declaratory Judgment Act based on ALM's Answer to Canales's Third Amended Complaint and ALM's responses to discovery requests; (2) ALM's counterclaims two through six should similarly be dismissed because there was no case or controversy at the time ALM filed its counterclaims; (3) ALM's counterclaim involving fraud on the United States Patent and Trademark Office ("USPTO") fails to meet the pleading standard set forth in Rule 9(b); and (4) all counterclaims asserted by ALM Media Properties, LLC, should be dismissed because it lacks capacity to bring the counterclaims. Dkt. No. 60.

The Court asked Canales at the hearing what new arguments were being made in his Third Motion to Dismiss that had not already been addressed by the Court in ruling on his first such motion. In response, Canales narrowed his contentions to the following three points: (1) ALM's Answer to Canales's Third Amended Complaint and responses to discovery demonstrate that there is no case or controversy; (2) ALM has failed to plead its counterclaim involving fraud on the USPTO with particularity; and (3) ALM Media Properties, LLC, does not have capacity to bring counterclaims in this case. In response, ALM contends that (1) Canales's arguments regarding the lack of a case or controversy in this dispute and the failure to plead fraud with particularity have already been addressed by this Court and (2) ALM Media Properties, LLC, has capacity to assert counterclaims against Canales because the counterclaims arise out of interstate business, are compulsory in nature, and ALM Media, LLC, is registered in Texas. Dkt. No. 62. After reviewing the parties arguments, both in writing and at the hearing, the Court will recommend that Canales's Third Motion to Dismiss (Dkt. No. 60) be **DENIED** in its entirety.

**1. Standing**

Canales re-asserts his argument that there is no controversy in the instant case. More specifically, Canales contends that the Fifth Circuit's decision in *Vantage Trailers, Inc. v. Beall Corp.,* 567 F.3d 745 (5th Cir.2009), should control the Court's analysis of ALM's counterclaim under the Federal Declaratory Judgment Act. Although the Court has already considered Canales's challenge to this particular counterclaim, *see* Dkt. Nos. 38, 48, he argues that ALM's counterclaims must be dismissed when ALM's Original Answer (Dkt. No. 56) and its responses to discovery requests are considered under the legal framework set forth in *Vantage Trailers.* However, the Court's review of the documents mentioned by Canales and the *Vantage Trailers* decision does not alter its opinion that Canales's motion to dismiss ALM's counterclaim under the Federal Declaratory Judgment Act should be denied.

**\*3** Pursuant to Rule 12(b)(1), courts may dismiss a claim for lack of subject matter jurisdiction. The party asserting jurisdiction must demonstrate subject matter jurisdiction by a preponderance of the evidence. *Young v. United States,* 727 F.3d 444, 446 (5th Cir.2013). For declaratory judgment actions, the plaintiff must establish that an actual controversy existed at the time the complaint was filed. *Vantage Trailers,* 567 F.3d at 748 (citing *Sierra Applied Sciences, Inc. v. Advanced Energy Indus., Inc.,* 363 F.3d 1361, 1373 (Fed.Cir.2004)). In *Vantage Trailers,* the Fifth Circuit applied the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007), which directed that "the dispute must be definite and concrete, real and substantial" and could not "be used to seek an opinion advising what the law would be on a hypothetical set of facts." *Vantage Trailers,* 567 F.3d at 748. Following *MedImmune,* the issue to be decided regarding standing in a federal declaratory judgment suit is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 549 U.S. at 127.

Even considering the standards set forth in *Vantage Trailers,* it is difficult for the Court to understand Canales's contention that there is no actual controversy in the instant case. Reduced to its most basic recitation, the parties are disputing who acquired rights to the

"SUPREMECOURTINSIDER" mark first. As noted by the Court in its previous report and recommendation, ALM's contention is that it acquired superior common law rights in the mark "SUPREMECOURTINSIDER" prior to any use in commerce by Canales. *See, e.g.,* Dkt. No. 38 at 9–10; *see also* Dkt. No. 56, ¶¶ 84, 162, 224. Therefore, when Canales continued to use the mark on his sites and when he submitted a Texas trademark application, he infringed upon ALM's rights in the mark. Again, Canales does not deny that he is continuing to use the mark on his websites nor does he dispute that he filed trademark applications in June and September of 2012. Thus, the controversy between ALM and Canales is sufficiently immediate, real, and definite to satisfy ALM's standing requirements under Article III.

Rather, what Canales appears to be arguing (again) is that ALM's Original Answer, Dkt. No. 56, and its discovery responses demonstrate that it abandoned the "SUPREMECOURTINSIDER" mark when ALM changed the name of its newsletter to "Supreme Court Brief" in January, 2013. As the Court stated at the hearing, the evidence suggests that ALM made the decision to rename the newsletter as a result of the filing of suit, with the intention to use the mark if it prevails in the suit. Further, whether ALM abandoned any claims it had to the "SUPREMECOURTINSIDER" mark is not an issue that should be resolved when discovery is still ongoing. More importantly, this contention misses the underlying theory of ALM's counterclaim—that it is Canales who is committing the infringing activity and continues to do so. The fact that ALM is not currently using the mark does not somehow invalidate its assertion that it has superior common law rights in the "SUPREMECOURTINSIDER" mark. Moreover, ALM clearly contends that it reserves the right to return to the use of the mark under its common law rights and explicitly denies that it has abandoned the mark. Dkt. No. 56, ¶ 84. Because Canales does not deny that he was using the mark at the time ALM filed its counterclaims, ALM has standing to assert its declaratory judgment counterclaim. Accordingly, the Court again overrules Canales's challenge that there is no controversy that would sustain ALM's counterclaims in this case.[4]

**\*4** Additionally, the Court finds the facts in *Vantage Trailers* distinguishable from the instant case. In *Vantage Trailers,* the Fifth Circuit held that there was no actual controversy between the parties because the design of the allegedly infringing product was not "substantially fixed and definite" when the plaintiff filed its declaratory judgment action. 567 F.3d at 749. The product in question had not yet been produced. Under ALM's contentions in this case, the infringing activity—use of the

"SUPREMECOURTINSIDER" mark—has and continues to occur as Canales still uses the mark on his website. Thus, this is not a case where it is unclear whether the allegedly infringing activity would occur in the future. It has occurred, and continues to occur. Consequently, the Court's recommendation here does not conflict with the Fifth Circuit's determination in *Vantage Trailers.*

**2. ALM's Counterclaim Alleging Fraud upon the USPTO**

To the extent Canales argues that ALM has failed to plead with requisite particularity its counterclaim that Canales committed fraud upon the USPTO, the Court disagrees. A motion to dismiss pursuant to Rule 9(b) tests the factual sufficiency of the plaintiffs' allegations. *See Tel–Phonic Services, Inc. v. TBS International, Inc.,* 975 F.2d 1134, 1138 (5th Cir.1992). The rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Pleading fraud with particularity requires "[a]t a minimum ... the particulars of time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel–Phonic Services, Inc.,* 975 F.2d at 1139; *see also Benchmark Elec., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.2003); *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir.1997).

Canales contends that the Court should adopt the approach taken in *Global Healing Center, LP v. Powell,* No. 4:10–CV–4790, 2012 WL 1709144 at *4–6 (S.D.Tex. May 15, 2012), which found that the defendants had failed to sufficiently plead the elements of a claim of fraud in the procurement of a trademark registration. In *Global Healing Center,* the court stated that "to prevail on a claim of fraud in the procurement of a registration, a proponent must plead and prove: (1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false ('scienter'); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; (5) damage proximately resulting from such reliance." *Id.* at 4 (internal quotations and citations omitted).

Even if the Court were to evaluate ALM's counterclaim under the rubric in *Global Healing Center,* it would still find that Canales's challenge fails.[5] First, ALM has identified precisely when Canales filed an application to register the "SUPREMECOURTINSIDER" mark with the

USPTO–September 25, 2012. *See* Dkt. No. 56, ¶ 215. ALM further alleges that Canales "falsely and fraudulently claimed that he was the 'owner of the trademark/service mark to be registered' and that 'no other person, firm, corporation, or association has the right to use the mark in commerce' " in a manner that would cause confusion, mistake, or deception. *Id.* ¶ 216. According to ALM, these statements were made by Canales over two years after he became "fully aware" of ALM's use of the mark. *Id.* Moreover, ALM states that it has and will continue to incur fees to defend the claims alleged by Canales in this suit even though ALM has already withdrawn its trademark application as a result of Canales's actions before the Trademark Trial and Appeal Board. *Id.* ¶¶ 217–219. These allegations sufficiently plead fraud with particularity under Rule 9(b) by identifying, "the particulars of time, place and contents of the false representations," *Tel–Phonic Services, Inc.,* 975 F.2d at 1139, as well as the elements set forth in *Global Healing Center.* ALM's allegation that Canales submitted the purported false statements to the USPTO despite actual knowledge of ALM's usage of the mark implicitly alleges that Canales did so intending for the USPTO to rely on the misrepresentation. The mere fact that ALM may not have explicitly stated as such does not convince this Court that ALM's counterclaim alleging fraud upon the USPTO should be dismissed at this time, particularly given the specific facts that have been explicitly pleaded. Accordingly, the Court rejects Canales's contentions on this issue.

### 3. Capacity

**\*5** Canales's final new point of contention is that ALM has admitted for the first time that ALM Media Properties, LLC ("ALMMP"), is not registered in the state of Texas pursuant to the Texas Business Organizations Code and consequently, lacks capacity to assert counterclaims in this case. Dkt. No. 60 at 14–16; *see also* TEX. BUS. ORGS.CODE § 9.051(b). Canales argues that both ALM's admission and a Certificate of Fact issued by the Texas Secretary of State show that ALMMP is not registered in Texas. Dkt. No. 60 at 15. In response, ALM submits that ALMMP is permitted to maintain counterclaims in this case because (1) it conducts business in interstate commerce, and (2) it has asserted compulsory counterclaims which are not precluded by TEX. BUS. ORGS.CODE § 9.051(b). Dkt. No. 62 at 9–13.

After reviewing the parties' arguments, the Court declines to adopt Canales's position and will recommend that the District Judge deny his Third Motion to Dismiss on this

point. TEX. BUS. ORGS.CODE § 9.051(b) provides that:

> A foreign filing entity or the entity's legal representative may not maintain an action, suit, or proceeding in a court of this state, brought either directly by the entity or in the form of a derivative action in the entity's name, on a cause of action *that arises out of the transaction of business in this state* unless the foreign filing entity is registered in accordance with this chapter.

(emphasis added). Although Section 9.051(b) does not explicitly define the parameters of what constitutes a "transaction of business in [Texas]," TEX. BUS. ORGS.CODE § 9.251 defines "activities that do *not* constitute transaction of business in [Texas]" and includes in its non-exhaustive list the activity of "transacting business in interstate commerce." TEX. BUS. ORGS.CODE § 9.251(9). In this case, ALMMP does not transact business in Texas; instead, it is an intellectual property holding company that registers federal marks for ALM Media, LLC. Based on its business activities, it does not appear that the limitations set forth by TEX. BUS. ORGS.CODE § 9.051(b) prohibit ALMMP from maintaining its counterclaims. Moreover, ALMMP's counterclaims clearly arise out of activities conducted in interstate commerce. Both parties contend that they used the "SUPREMECOURTINSIDER" mark in commerce prior to any use by the other party, thereby obtaining superior rights in the mark. *See, e.g.,* Dkt. No. 53, ¶ 35; Dkt. No. 56, ¶¶ 148, 162, 178. ALM's use of the "SUPREMECOURTINSIDER" mark in promoting and distributing its newsletter and Canales's subsequent attempt to register the mark with the USPTO demonstrate both parties' use or intent to use the mark in interstate commerce. Accordingly, the Court finds that ALMMP is not prohibited from maintaining its counterclaims by the Texas statute.

Additionally, the Court also concludes that ALMMP's counterclaims are compulsory and thus, not precluded by TEX. BUS. ORGS.CODE § 9.051(b) even if the statute were applicable in this case. While neither Texas courts nor the Fifth Circuit have addressed the implication of TEX. BUS. ORGS.CODE § 9.051(b) upon compulsory counterclaims, the Fifth Circuit has considered this issue in the context of a nearly-identical Mississippi statute. *See*

*Envtl. Coatings, Inc. v. Baltimore Paint & Chem. Co.,* 617 F.2d 110 (5th Cir.1980); *see also Atrium Companies, Inc. v. ESR Assoc., Inc.,* No. 11–CV–1288, 2012 WL 4215103 at *8–9 (S.D.Tex. Sept.18, 2012) (discussing the *Environmental Coatings* decision and finding it persuasive in construing TEX. BUS. ORGS.CODE § 9.051(b)). In *Environmental Coatings,* the Fifth Circuit determined that a Mississippi statute which barred suits by a foreign corporation that had not obtained a certificate of authority to do business in Mississippi, did not preclude it from presenting compulsory counterclaims and third-party complaints. *Envtl. Coatings, Inc.,* 617 F.2d at 111. The court specifically noted that the statute permitted foreign corporations to "defend against suits, actions or proceedings brought in courts in Mississippi" and reasoned that the legislature "would not have expressly permitted defense by nonqualifying corporate defendants but impliedly circumscribed the scope of that defense by denying the right to bring compulsory counterclaims or third-party complaints." *Id.* at 112. Finding this reasoning persuasive with regard to the Texas statute, the Court concludes that TEX. BUS. ORGS.CODE § 9.051(b) does not bar ALMMP from maintaining its counterclaims.

**\*6** As such, the remaining issue is whether ALMMP brings compulsory counterclaims. In evaluating whether a counterclaim is compulsory, the Fifth Circuit has counseled that courts should consider the following four questions:

> (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether res judicata would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim.

*Songcharoen v. Plastic & Hand Surgery Assoc., PLLC,* No. 13–60315, 2014 WL 1304636 at *11 (5th Cir. Apr.2, 2014) (citing *Tank Insulation Int'l, Inc. v. Insultherm, Inc.,* 104 F.3d 83, 85–86 (5th Cir.1997)). "If any of the four questions results in an affirmative answer, the counterclaim is compulsory." The counterclaims brought by ALMMP are plainly compulsory. At the very least,

there is a logical connection between the claims and counterclaims in this case, which arise out of the parties' dispute over the use of the "SUPREMECOURTINSIDER" mark. An ultimate determination on the merits would necessarily involve similar issues of fact and law and be based upon substantially similar evidence. Consequently, the Court concludes that ALMMP's counterclaims are compulsory and not barred by TEX. BUS. ORGS.CODE § 9.051(b).

## II. RECOMMENDATION

In accordance with the preceding discussion, the Court **RECOMMENDS** that the District Judge **DENY** Plaintiff/Counter–Defendant Ramiro Canales's Second Motion to Dismiss Counterclaims and Affirmative Defenses (Dkt. No. 55) and his Third Motion to Dismiss Counterclaims and Affirmative Defenses (Dkt. No. 60) in their entirety.

## III. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir.1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 150–53, 106 S.Ct. 466, 472–74, 88 L.Ed.2d 435 (1985); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir.1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2807677

pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2807677

Footnotes

1   Canales filed his first Motion to Dismiss Counterclaims and Affirmative Defenses in March, 2013. *See* Dkt. No. 27. The undersigned has already submitted a recommendation, adopted by Judge Yeakel, on Canales's first motion. Dkt. Nos. 38, 48.

2   Because the general and relevant background in this case has already been set forth in a previous filing, the Court will not restate it here. *See* Dkt. No. 38 at 1–3.

3   Although the Court has attempted to construe Canales's pleadings broadly, Canales's argument still remains somewhat ambiguous. For example, the Court notes that Canales also appears to seek dismissal of ALM's Original Answer to Canales's Second Amended Complaint (Dkt. No. 52) despite the fact that ALM's Original Answer was filed prior to Canales's Third Amended Complaint. Dkt. No. 55 at 5.

4   As for Canales's assertion that ALM's counterclaims two through six should also be dismissed because there was no controversy at the time ALM filed its counterclaims, the Court similarly rejects Canales's contention for the reasons stated herein and in the Court's previous report and recommendation (Dkt. No. 38).

5   The Court notes that, while helpful, *Global Healing Center* is not controlling precedent in this case.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

**HOLLAND & HART** 

**Amanda N. Marston**
**Phone** (303) 473-2712
anmarston@hollandhart.com

34040.0001

August 7 2019

**By Email: info@jeffersonbank.com**
**Confirmation by U.S. CERTIFIED MAIL**

Mr. Todd Brockwell, President
Monticello Wealth Management
c/o Jefferson Bank
1777 Northeast Loop 410, Suite 200
San Antonio, Texas  78217

     **Re:**    **Unauthorized Use of MONTICELLO Marks**

Dear Mr. Brockwell:

    We represent B. Grady Durham and his licensee, Monticello Associates, (collectively "Monticello") in intellectual property matters.  Monticello is an independent asset management consulting firm that provides investment advisory services.  Monticello has used the trademark MONTICELLO to offer its financial and investment advisory services throughout the United States continuously since 1992.  On June 1, 1993 the United States Patent and Trademark Office issued U.S. Reg. No. 1774429 for the mark **MONTICELLO ASSOCIATES** covering "asset management consulting services" in Class 36.  As a result of Monticello's great commercial success, its hard-earned reputation, and the trust it has developed with its client-base, MONTICELLO has become an important and valuable asset of Monticello.

    Monticello recently learned from one of its clients, who received a solicitation from you, that Jefferson Bank ("Jefferson") is using MONTICELLO and a remarkably similar logo in connection with offering its financial advisory and consulting services.

    Because Jefferson is using MONTICELLO to offer wealth management services to Monticello's customers, Monticello is understandably concerned about current and future consumer confusion.  Accordingly, Monticello demands that you immediately cease use of MONTICELLO any confusingly similar terms or graphical elements in the course of offering your financial services and wealth planning or other related advisory services.

T 303.473.2700   F 303.473.2720
One Boulder Plaza, 1800 Broadway, Suite 300
Boulder, CO 80302-5289
www.hollandhart.com

| Alaska | Montana | Utah |
| Colorado | Nevada | Washington, D.C. |
| Idaho | New Mexico | Wyoming |



Mr. Todd Brockwell
Monticello Wealth Management
August 7, 2019
Page 2

Monticello is hopeful this matter can be amicably resolved without the need for further action.  We therefore look forward to your confirmation on or before August 20, 2019. In the meantime, please feel free to contact me, or have your counsel contact me.

Sincerely,

Amanda N. Marston
for Holland & Hart LLP

cc:   Scott Havlick, Esq.

13379826_3

| Alaska | Montana | Utah |
| Colorado | Nevada | Washington, D.C. |
| Idaho | New Mexico | Wyoming |

# EXHIBIT E

# FORM ADV

### UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: MONTICELLO ASSOCIATES INC** | **CRD Number: 107392** |
| **Annual Amendment - All Sections** | **Rev. 10/2017** |
| **4/5/2019 12:58:31 PM** | |

---

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.   Your full legal name (if you are a sole proprietor, your last, first, and middle names):
   **MONTICELLO ASSOCIATES INC**

B.   (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
   **MONTICELLO ASSOCIATES INC**

   *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

   (2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

   *If you check this box, complete a Schedule R for each relying adviser.*

C.   If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
   ☐ your legal name or ☐ your primary business name:

D.   (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-51758**
   (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:
   (3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:
No Information Filed

E.   (1) If you have a number ("*CRD Number*") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **107392**

   *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

   (2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F.   *Principal Office and Place of Business*
   (1) Address (do not use a P.O. Box):

| | |
|---|---|
| Number and Street 1: | Number and Street 2: |
| 1800 LARIMER STREET | SUITE 2100 |
| City:     State: | Country:     ZIP+4/Postal Code: |
| DENVER     Colorado | United States     80202 |

   If this address is a private residence, check this box: ☐

   *List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

   (2) Days of week that you normally conduct business at your *principal office and place of business*:
   ⦿ Monday - Friday ○ Other:
   Normal business hours at this location:
   8:00 A.M. - 5:00 P.M.
   (3) Telephone number at this location:
   303-572-6300
   (4) Facsimile number at this location, if any:
   303-572-6305
   (5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of

the end of your most recently completed fiscal year?

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1:     Number and Street 2:

City:     State:     Country:     ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:     Number and Street 2:

City:     State:     Country:     ZIP+4/Postal Code:

|  | Yes | No |
|---|---|---|
| I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? | ◉ | ○ |

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:     Other titles, if any:

Telephone number:     Facsimile number, if any:

Number and Street 1:     Number and Street 2:

City:     State:     Country:     ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:     Titles:

Telephone number:     Facsimile number, if any:

Number and Street 1:     Number and Street 2:

City:     State:     Country:     ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  | Yes | No |
|---|---|---|
| L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ◉ | ○ |

*If "yes," complete Section 1.L. of Schedule D.*

|  | Yes | No |
|---|---|---|
| M. Are you registered with a *foreign financial regulatory authority*? | ○ | ◉ |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  | Yes | No |
|---|---|---|
| N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? | ○ | ◉ |

|  | Yes | No |
|---|---|---|
| O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year? | ○ | ◉ |

If yes, what is the approximate amount of your assets:

○ $1 billion to less than $10 billion

○ $10 billion to less than $50 billion

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.   Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Section 1.F. for each location. If you are applying for SEC registration, if you are registered only with the SEC, or if you are an *exempt reporting adviser*, list only the largest twenty-five offices (in terms of numbers of *employees*).

Number and Street 1:  
KEY TOWER

Number and Street 2:  
127 PUBLIC SQUARE, SUITE 5200

| City: | State: | Country: | ZIP+4/Postal Code: |
|-------|--------|----------|--------------------|
| CLEVELAND | Ohio | United States | 44114 |

If this address is a private residence, check this box: ☐

Telephone Number:  
216-771-4113

Facsimile Number, if any:  
216-771-5886

If this office location is also required to be registered with FINRA or a *state securities authority* as a branch office location for a broker-dealer or investment adviser on the Uniform Branch Office Registration Form (Form BR), please provide the *CRD* Branch Number here:

How many *employees* perform investment advisory functions from this office location?  
3

Are other business activities conducted at this office location? (check all that apply)

☐ (1) Broker-dealer (registered or unregistered)

☐ (2) Bank (including a separately identifiable department or division of a bank)

☐ (3) Insurance broker or agent

☐ (4) Commodity pool operator or commodity trading advisor (whether registered or exempt from registration)

☐ (5) Registered municipal advisor

☐ (6) Accountant or accounting firm

☐ (7) Lawyer or law firm

Describe any other *investment-related* business activities conducted from this office location:

---

Complete the following information for each office, other than your *principal office and place of business*, at which you conduct investment advisory business. You must complete a separate Schedule D Section 1.F. for each location. If you are applying for SEC registration, if you are registered only with the SEC, or if you are an *exempt reporting adviser*, list only the largest twenty-five offices (in terms of numbers of *employees*).

Number and Street 1:  
109 STATE STREET

Number and Street 2:  
SUITE 401

| City: | State: | Country: | ZIP+4/Postal Code: |
|-------|--------|----------|--------------------|
| BOSTON | Massachusetts | United States | 02109 |

If this address is a private residence, check this box: ☐

Telephone Number:
303-572-6320

If this office location is also required to be registered with FINRA or a *state securities authority* as a branch office location for a broker-dealer or investment adviser on the Uniform Branch Office Registration Form (Form BR), please provide the *CRD* Branch Number here:

How many *employees* perform investment advisory functions from this office location?
1

Are other business activities conducted at this office location? (check all that apply)

☐ (1) Broker-dealer (registered or unregistered)

☐ (2) Bank (including a separately identifiable department or division of a bank)

☐ (3) Insurance broker or agent

☐ (4) Commodity pool operator or commodity trading advisor (whether exempt from registration)

☐ (5) Registered municipal advisor

☐ (6) Accountant or accounting firm

☐ (7) Lawyer or law firm

Describe any other *investment-related* business activities conducted from this office location:

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:     HTTPS://WWW.FACEBOOK.COM/MONTICELLO-ASSOCIATES-414036032090180/

Address of Website/Account on Publicly Available Social Media Platform:     HTTPS://PLUS.GOOGLE.COM/+MONTICELLOASSOCIATESINC

Address of Website/Account on Publicly Available Social Media Platform:     HTTP://WWW.MONTICELLOASSOCIATES.COM

Address of Website/Account on Publicly Available Social Media Platform:     HTTPS://TWITTER.COM/MONTICELLOASSOC

Address of Website/Account on Publicly Available Social Media Platform:     HTTPS://WWW.LINKEDIN.COM/COMPANY/MONTICELLO-ASSOCIATES

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
SMARSH

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 851 SW 6TH AVENUE | | SUITE 800 | |

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| PORTLAND | Oregon | United States | 97204 |

If this address is a private residence, check this box: ☐

Telephone Number:               Facsimile number, if any:
866-762-7741                    971-998-9967

This is (check one):
○ one of your branch offices or affiliates.

○ a third-party unaffiliated recordkeeper.

○ other.

Briefly describe the books and records kept at this location.
ARCHIVED ELECTRONIC MAIL COMMUNICATION.

---

Name of entity where books and records are kept:
FORTRUST

Number and Street 1:                                    Number and Street 2:
4300 BRIGHTON BLVD.

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| DENVER | Colorado | United States | 80216 |

If this address is a private residence, check this box: ☐

Telephone Number:                        Facsimile number, if any:
866-265-4423

This is (check one):
○ one of your branch offices or affiliates.

◉ a third-party unaffiliated recordkeeper.

○ other.

Briefly describe the books and records kept at this location.
DUPLICATED ELECTRONIC MAIL COMMUNICATION AND FILE SERVER SYSTEMS.

---

Name of entity where books and records are kept:
MONTICELLO ASSOCIATES, INC.

Number and Street 1:                                    Number and Street 2:
KEY TOWER                                               127 PUBLIC SQUARE, SUITE 2440

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| CLEVELAND | Ohio | United States | 44114 |

If this address is a private residence, check this box: ☐

Telephone Number:                        Facsimile number, if any:
216-771-4113                             216-771-5886

This is (check one):
◉ one of your branch offices or affiliates.

○ a third-party unaffiliated recordkeeper.

○ other.

Briefly describe the books and records kept at this location.
VARIOUS BOOKS AND RECORDS

---

Name of entity where books and records are kept:
IRON MOUNTAIN

Number and Street 1:                                    Number and Street 2:
15505 EAST HINSDALE CIRCLE

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| ENGLEWOOD | Colorado | United States | 80112 |

If this address is a private residence, check this box: ☐

Telephone Number:                        Facsimile number, if any:

This is (check one):
- ○ one of your branch offices or affiliates.
- ● a third-party unaffiliated recordkeeper.
- ○ other.

Briefly describe the books and records kept at this location.
ELECTRONIC BACK-UP SYSTEM TAPES AND HARD COPY ORIGINAL AND DUPLICATE FIRM OPERATIONAL DOCUMENTS.

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

---

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A.  To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

   You (the adviser):

   ☐ (1)  are a **large advisory firm** that either:

      (a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

      (b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

   ☐ (2)  are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

      (a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

      (b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

         Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.

   (3)  Reserved

   ☐ (4)  have your *principal office and place of business* **outside the United States**;

   ☐ (5)  are an **investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

   ☐ (6)  are an **investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

   ☑ (7)  are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

   ☐ (8)  are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

      *If you check this box, complete Section 2.A.(8) of Schedule D.*

   ☐ (9)  are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days**;

      *If you check this box, complete Section 2.A.(9) of Schedule D.*

   ☐ (10)  are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

      *If you check this box, complete Section 2.A.(10) of Schedule D.*

   ☐ (11)  are an **Internet adviser** relying on rule 203A-2(e);

   ☐ (12)  have **received an SEC order** exempting you from the prohibition against registration with the SEC;

      *If you check this box, complete Section 2.A.(12) of Schedule D.*

   ☐ (13)  are **no longer eligible** to remain registered with the SEC.

*State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers*

C. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, you may fill in certain boxes to provide the *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☑ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☐ TX |
| ☑ CA | ☐ KY | ☐ NM | ☐ UT |
| ☑ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☑ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☑ VA |
| ☐ DC | ☐ MA | ☑ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

---

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser

-

---

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:

803-

Date of *order*:

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.  How are you organized?

   ⦿ Corporation

   ○ Sole Proprietorship

   ○ Limited Liability Partnership (LLP)

   ○ Partnership

   ○ Limited Liability Company (LLC)

   ○ Limited Partnership (LP)

   ○ Other (specify):

   *If you are changing your response to this Item, see Part 1A Instruction 4.*

B.  In what month does your fiscal year end each year?
   DECEMBER

C.  Under the laws of what state or country are you organized?

   State      Country

   Delaware  United States

   *If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

   *If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

|  | Yes | No |
|---|---|---|
| A.  Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ⦿ |

   *If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B.  Date of Succession: (MM/DD/YYYY)

   *If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

---

**SECTION 4 Successions**

No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

*Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A.  Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

53

B.  (1)  Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

28

(2)  Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3)  Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

2

(4)  Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5)  Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6)  Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees **and count a firm only once – do not count each of the firm's** employees that solicit on your behalf.*

### Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C.  (1)  To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2)  Approximately what percentage of your *clients* are non-*United States persons*?

0%

D.  *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (d)(1) or (d)(3) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| Type of *Client* | (1) Number of Client(s) | (2) Fewer than 5 Clients | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | ☐ | $ |
| (b) *High net worth individuals* | 230 | ☐ | $ |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | | | $ |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 26 | ☐ | $ |
| (h) Charitable organizations | 177 | ☐ | $ |
| (i) State or municipal *government entities* (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |

| | | | |
|---|---|---|---|
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☑ | $ |
| (n) Other: | | ☐ | $ |

---

**Compensation Arrangements**

E.   You are compensated for your investment advisory services by (check all that apply):

- ☐ (1)   A percentage of assets under your management
- ☐ (2)   Hourly charges
- ☐ (3)   Subscription fees (for a newsletter or periodical)
- ☑ (4)   Fixed fees (other than subscription fees)
- ☐ (5)   Commissions
- ☐ (6)   *Performance-based fees*
- ☐ (7)   Other (specify):

---

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

                                                                                                          Yes   No

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?   ○   ◉

(2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|---|
| Discretionary: | (a) | $ | (d) | |
| Non-Discretionary: | (b) | $ | (e) | |
| Total: | (c) | $ | (f) | |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3)   What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

---

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G.   What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1)   Financial planning services
- ☐ (2)   Portfolio management for individuals and/or small businesses
- ☐ (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☐ (4)   Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☑ (6)   Pension consulting services
- ☑ (7)   Selection of other advisers (including *private fund* managers)
- ☐ (8)   Publication of periodicals or newsletters
- ☐ (9)   Security ratings or pricing services
- ☐ (10)  Market timing services
- ☐ (11)  Educational seminars/workshops
- ☑ (12)  Other(specify): GENERAL ASSET MANAGEMENT CONSULTING SERVICES

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○   0
- ○   1 - 10
- ○   11 - 25
- ○   26 - 50
- ○   51 - 100
- ○   101 - 250
- ○   251 - 500
- ○   More than 500

   If more than 500, how many?
   (round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

|  |  | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ◉ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

    (a) *sponsor* to a *wrap fee program*
      $

    (b) portfolio manager for a *wrap fee program*?
      $

    (c) *sponsor* to and portfolio manager for the same *wrap fee program*?
      $

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

|  |  | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |
|  | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ◉ |

K.    Separately Managed Account *Clients*

|  | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ◉ |

*If yes, complete Section 5.K.(1) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ○ |

*If yes, complete Section 5.K.(2) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ○ |

*If yes, complete Section 5.K.(2) of Schedule D.*

|  | Yes | No |
|---|---|---|
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ○ |

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

---

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

---

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

---

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | | Mid-year | End of year |
|---|---|---|---|
| (i) | Exchange-Traded Equity Securities | % | % |
| (ii) | Non Exchange-Traded Equity Securities | % | % |
| (iii) | U.S. Government/Agency Bonds | % | % |
| (iv) | U.S. State and Local Bonds | % | % |
| (v) | *Sovereign Bonds* | % | % |
| (vi) | Investment Grade Corporate Bonds | % | % |
| (vii) | Non-Investment Grade Corporate Bonds | % | % |
| (viii) | Derivatives | % | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) | Cash and Cash Equivalents | % | % |
| (xii) | Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | | End of year |
|---|---|---|
| (i) | Exchange-Traded Equity Securities | % |
| (ii) | Non Exchange-Traded Equity Securities | % |
| (iii) | U.S. Government/Agency Bonds | % |
| (iv) | U.S. State and Local Bonds | % |
| (v) | *Sovereign Bonds* | % |
| (vi) | Investment Grade Corporate Bonds | % |
| (vii) | Non-Investment Grade Corporate Bonds | % |
| (viii) | Derivatives | % |
| (ix) | Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) | Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % |
| (xi) | Cash and Cash Equivalents | % |
| (xii) | Other | % |

Generally describe any assets included in "Other"

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☐ No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a)  In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b)  In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.   You are actively engaged in business as a (check all that apply):

    ☐ (1)   broker-dealer (registered or unregistered)
    ☐ (2)   registered representative of a broker-dealer
    ☐ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    ☐ (4)   futures commission merchant
    ☐ (5)   real estate broker, dealer, or agent
    ☐ (6)   insurance broker or agent
    ☐ (7)   bank (including a separately identifiable department or division of a bank)
    ☐ (8)   trust company
    ☐ (9)   registered municipal advisor
    ☐ (10)   registered security-based swap dealer
    ☐ (11)   major security-based swap participant
    ☐ (12)   accountant or accounting firm
    ☐ (13)   lawyer or law firm
    ☐ (14)   other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

        **Yes   No**

B.   (1)   Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)?   ○   ◉

    (2)   If yes, is this other business your primary business?   ○   ○

    *If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

        **Yes   No**

    (3)   Do you sell products or provide services other than investment advice to your advisory *clients*?   ○   ◉

    *If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

---

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.   This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

    ☐ (1)   broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
    ☐ (2)   other investment adviser (including financial planners)
    ☐ (3)   registered municipal advisor
    ☐ (4)   registered security-based swap dealer
    ☐ (5)   major security-based swap participant
    ☐ (6)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
    ☐ (7)   futures commission merchant
    ☐ (8)   banking or thrift institution
    ☐ (9)   trust company
    ☐ (10)   accountant or accounting firm
    ☐ (11)   lawyer or law firm

- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

## SECTION 7.A. Financial Industry Affiliations

No Information Filed

## Item 7 *Private Fund* Reporting

**Yes No**

B. Are you an adviser to any *private fund*?   ☐ ☑

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

## SECTION 7.B.(1) *Private Fund* Reporting

No Information Filed

## SECTION 7.B.(2) *Private Fund* Reporting

No Information Filed

## Item 8 Participation or Interest in *Client* Transactions

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

## Proprietary Interest in *Client* Transactions

**Yes No**

A. Do you or any *related person*:

(1)  buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)?   ☐ ☑

(2)  buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*?   ☐ ☑

(3)  recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary   ☐ ☑

(ownership) interest (other than those mentioned in Items 8.A.(1) or (2))?

## Sales Interest in *Client* Transactions

| | | Yes | No |
|---|---|---|---|
| B. | Do you or any *related person*: | | |
| | (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| | (2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ○ | ◉ |
| | (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

## Investment or Brokerage Discretion

| | | Yes | No |
|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | |
| | (1) securities to be bought or sold for a *client's* account? | ○ | ◉ |
| | (2) amount of securities to be bought or sold for a *client's* account? | ○ | ◉ |
| | (3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ○ | ◉ |
| | (4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ○ | ◉ |
| D. | If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? | ○ | ○ |
| E. | Do you or any *related person* recommend brokers or dealers to *clients*? | ○ | ◉ |
| F. | If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? | ○ | ○ |
| G. | (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? | ○ | ◉ |
| | (2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? | ○ | ○ |
| H. | (1) Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? | ○ | ◉ |
| | (2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? | ○ | ◉ |
| I. | Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? | ○ | ◉ |

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

## Item 9 Custody

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

| | | Yes | No |
|---|---|---|---|
| A. | (1) Do you have *custody* of any advisory *clients'*: | | |
| | (a) cash or bank accounts? | ○ | ◉ |
| | (b) securities? | ○ | ◉ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

U.S. Dollar Amount

(a) $

Total Number of *Clients*

(b)

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

| | | Yes | No |
|---|---|---|---|
| B. | (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: | | |

(a) cash or bank accounts?

(b) securities?

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client funds* and securities and total number of *clients* for which your *related persons* have *custody*:

U.S. Dollar Amount                    Total Number of *Clients*

(a) $                                  (b)

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools. ☐

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

D. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?     **Yes  No**

(1) you act as a qualified custodian                                                              ○    ◉

(2) your *related person(s)* act as qualified custodian(s)                                        ○    ◉

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients?*

---

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

**Yes  No**

A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?     ○    ◉

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A. *Control Persons***

No Information Filed

No Information Filed

---

## Item 11 Disclosure Information

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed: you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

|  | Yes | No |
|---|:---:|:---:|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ◉ |

<u>For "yes" answers to the following questions, complete a Criminal Action DRP:</u>

|  | Yes | No |
|---|:---:|:---:|
| A.  In the past ten years, have you or any *advisory affiliate*: |  |  |
| (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (2)  been *charged* with any *felony*? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| B.  In the past ten years, have you or any *advisory affiliate*: | | |
|---|:---:|:---:|
| (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| (2)  been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ◉ |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

<u>For "yes" answers to the following questions, complete a Regulatory Action DRP:</u>

|  | Yes | No |
|---|:---:|:---:|
| C.  Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: |  |  |
| (1)  *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ◉ |
| (3)  *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4)  entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ◉ |
| (5)  imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ◉ |
| D.  Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: |  |  |
| (1)  ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2)  ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3)  ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4)  in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5)  ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |
| E.  Has any *self-regulatory organization* or commodities exchange ever: |  |  |
| (1)  *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule* | ○ | ◉ |

(3) *found* you or any *advisory affiliate* ~~Case 5:19-cv-01206 Document 1 Filed 10/08/19 Page 55 of 74~~ization to do business denied, suspended, revoked, or restricted?    ○  ◉

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?    ○  ◉

F.  Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?    ○  ◉

G.  Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?    ○  ◉

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

|  |  | Yes | No |
|---|---|---|---|
| H. (1) | Has any domestic or foreign court: | | |
| | (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ◉ |
| | (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ◉ |
| | (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ◉ |
| (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ◉ |

---

## Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

|  |  | Yes | No |
|---|---|---|---|
| A. | Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ◉ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B.  Do you:

(1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year?    ○  ○

(2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year?    ○  ○

C.  Are you:

(1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year?    ○  ○

(2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year?    ○  ○

---

## Schedule A

### Direct Owners and Executive Officers

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

(a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;

(b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act):

Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing

the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital:

   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?  ◯ Yes  ◉ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:    NA - less than 5%     B - 10% but less than 25%    D - 50% but less than 75%

                        A - 5% but less than 10%    C - 25% but less than 50%    E - 75% or more

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| HALVORSEN, STEVEN, ERIK | I | MANAGING DIRECTOR | 03/2001 | NA | Y | N | 2124404 |
| CLEWORTH, MONTGOMERY, CLARKSON | I | MANAGING DIRECTOR | 03/2001 | NA | Y | N | 1555672 |
| ZIMMERMAN, KEVIN, ANDREW | I | MANAGING DIRECTOR | 01/2006 | NA | Y | N | 3176940 |
| RIEDLIN, JOHN, ERIC | I | MANAGING DIRECTOR | 01/2007 | NA | Y | N | 1109351 |
| SWARTZ, TERESA, ANN | I | CHIEF OPERATING OFFICER | 11/2006 | NA | Y | N | 4420503 |
| SULLIVAN, PATRICK, FRANCIS | I | MANAGING DIRECTOR | 01/2007 | NA | Y | N | 5294642 |
| SLETTEN, JEFFREY, DEAN | I | MANAGING DIRECTOR | 01/2009 | NA | Y | N | 2895961 |
| DURHAM, BRENTON, GRADY | I | PRESIDENT | 07/1992 | E | Y | N | 1158124 |
| HARRIGAN, BRIAN, PATRICK | I | MANAGING DIRECTOR | 01/2013 | NA | Y | N | 6176828 |
| Kilpela, Jennifer, Mandeville | I | MANAGING DIRECTOR | 01/2016 | NA | Y | N | 6625533 |
| Terborgh, Andrew, George | I | MANAGING DIRECTOR | 01/2017 | NA | Y | N | 6752650 |
| ADAMS, AMANDA, LOUISE | I | MANAGING DIRECTOR - DIRECTOR OF RESEARCH | 01/2018 | NA | Y | N | 6909261 |
| HAYS, WESTLEY, MORGAN | I | MANAGING DIRECTOR | 01/2018 | NA | Y | N | 6228207 |
| SAPP, JENNIFER, ANN | I | CHIEF COMPLIANCE OFFICER | 01/2018 | NA | N | N | 6909269 |

## Schedule B

### Indirect Owners

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation:

      For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital:

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:    C - 25% but less than 50%    E - 75% or more

                        D - 50% but less than 75%    F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

No Information Filed

---

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

---

**Schedule R**

No Information Filed

---

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Arbitration DRPs**

No Information Filed

**Bond DRPs**

No Information Filed

**Judgment/Lien DRPs**

No Information Filed

**Part 1B Item 1 - State Registration**

**You must complete this Part 1B only if you are applying for registration, or are registered, as an investment adviser with any of the *state securities authorities*.**

Complete this Item 1 if you are submitting an initial application for state registration or requesting additional state registration(s). Check the boxes next to the states to which you are submitting this application. If you are already registered with at least one state and are applying for registration with an additional state or states, check the boxes next to the states in which you are applying for registration. Do not check the boxes next to the states in which you are currently registered or where you have an application for registration pending.

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☐ TX |
| ☑ CA | ☐ KY | ☐ NM | ☐ UT |
| ☑ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |

| | | | |
|---|---|---|---|
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MO | ☐ PR | ☐ WY |
| ☐ HI | ☐ MT | ☐ RI | |
| ☐ ID | | | |

---

### Part 1B Item 2 - Additional Information

Complete this Item 2A. only if the person responsible for supervision and compliance does not appear in Item 1J. or 1K. of Form ADV Part 1A:

A.   Person responsible for supervision and compliance:

Name:                                                          Title:

Telephone:                                                  Fax:

Number and Street 1:                                  Number and Street 2:

City:                    State:                            Country:                    ZIP+4/Postal Code:

Email address, if available:

If this address is a private residence, check this box: ☐

B.   Bond/Capital Information, if required by your *home state*

(1)  Name of Issuing Insurance Company:

(2)  Amount of Bond:

$ .00

(3)  Bond Policy Number:

|  | Yes | No |
|---|---|---|
| (4)  If required by your home state, are you in compliance with your home state's minimum capital requirements? | ○ | ○ |

### Part 1B - Disclosure Questions

#### BOND DISCLOSURE

For "yes" answers to the following question, complete a Bond DRP.

|  | Yes | No |
|---|---|---|
| C.   Has a bonding company ever denied, paid out on, or revoked a bond for you, any *advisory affiliate*, or any *management person*? | ○ | ◉ |

#### JUDGMENT/LIEN DISCLOSURE

For "yes" answers to the following question, complete a Judgment/Lien DRP.

|  | Yes | No |
|---|---|---|
| D.   Are there any unsatisfied judgments or liens against you, any *advisory affiliate*, or any *management person*? | ○ | ◉ |

#### ARBITRATION DISCLOSURE

For "yes" answers to the following questions, complete an Arbitration DRP.

E.   Are you, any *advisory affiliate*, or any *management person* currently the subject of, or have you, any *advisory affiliate*, or any *management person* been the subject of, an arbitration claim alleging damages in excess of $2,500, involving any of the following:

|  | Yes | No |
|---|---|---|
| (1)  any investment or an *investment-related* business or activity? | ○ | ◉ |
| (2)  fraud, false statement, or omission? | ○ | ◉ |
| (3)  theft, embezzlement, or other wrongful taking of property? | ○ | ◉ |
| (4)  bribery, forgery, counterfeiting, or extortion? | ○ | ◉ |
| (5)  dishonest, unfair, or unethical practices? | ○ | ◉ |

#### CIVIL JUDICIAL DISCLOSURE

For "yes" answers to the following questions, complete a Civil Judicial Action DRP.

F.   Are you, any *advisory affiliate*, or any *management person* currently subject to, or have you, any *advisory affiliate*, or any *management person* been *found* liable in, a civil, *self-regulatory organization*, or administrative *proceeding* involving any of the following:

|  | Yes | No |
|---|---|---|
| (1)  an investment or *investment-related* business or activity? | ○ | ◉ |
| (2)  fraud, false statement, or omission? | ○ | ◉ |
| (3)  theft, embezzlement, or other wrongful taking of property? | ○ | ◉ |
| (4)  bribery, forgery, counterfeiting, or extortion? | ○ | ◉ |
| (5)  dishonest, unfair, or unethical practices? | ○ | ◉ |

### Part 1B - Business Information

G.   Other Business Activities

(1)  Are you, any *advisory affiliate*, or any *management person* actively engaged in business as a(n) (check all that apply):

☐ Tax Preparer

☐ Issuer of securities

☐ Sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles

☐ Sponsor, general partner, managing member (or equivalent) of pooled investment vehicles
☐ Real estate adviser

(2) If you, any *advisory affiliate*, or any *management person* are actively engaged in any business other than those listed in Item 6.A of Part 1A or Item 2.G(1) of Part 1B, describe the business and the approximate amount of time spent on that business:

H. If you provide financial planning services, the investments made based on those services at the end of your last fiscal year totaled:

| | Securities Investments | Non-Securities Investments |
|---|:---:|:---:|
| Under $100,000 | ○ | ○ |
| $100,001 to $500,000 | ○ | ○ |
| $500,001 to $1,000,000 | ○ | ○ |
| $1,000,001 to $2,500,000 | ○ | ○ |
| $2,500,001 to $5,000,000 | ○ | ○ |
| More than $5,000,000 | ○ | ○ |

If securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

If non-securities investments are over $5,000,000, how much? (round to the nearest $1,000,000)

I. *Custody* — **Yes  No**

(1) Advisory Fees

Do you withdraw advisory fees directly from your *clients'* accounts? If you answered "yes", respond to the following: ○  ⦿

(a) Do you send a copy of your invoice to the custodian or trustee at the same time that you send a copy to the *client*? ○  ○

(b) Does the custodian send quarterly statements to your *clients* showing all disbursements for the custodian account, including the amount of the advisory fees? ○  ○

(c) Do your *clients* provide written authorization permitting you to be paid directly for their accounts held by the custodian or trustee? ○  ○

(2) Pooled Investment Vehicles and Trusts

(a) (i) Do you or a *related person* act as a general partner, managing member, or person serving in a similar capacity, for any pooled investment vehicle for which you are the adviser to the pooled investment vehicle, or for which you are the adviser to one or more of the investors in the pooled investment vehicle? If you answered "yes", respond to the following: ○  ⦿

(a) (ii) As the general partner, managing member, or person serving in a similar capacity, have you or a *related person* engaged any of the following to provide authority permitting each direct payment or any transfer of funds or securities from the account of the pooled investment vehicle?

Attorney ○  ○

Independent certified public accountant ○  ○

Other independent party ○  ○

Describe the independent party:

*For purposes of this Item 2I.2(a), "Independent party" means a person that: (A) is engaged by the investment adviser to act as a gatekeeper for the payment of fees, expenses and capital withdrawals from the pooled investment; (B) does not control and is not controlled by and is not under common control with the investment adviser; (C) does not have, and has not had within the past two years, a material business relationship with the investment adviser; and (D) shall not negotiate or agree to have material business relations or commonly controlled relations with an investment adviser for a period of two years after serving as the person engaged in an independent party agreement.*

(b) Do you or a *related person* act as investment adviser and a trustee for any trust, or act as a trustee for any trust in which your advisory clients are beneficiaries of the trust? ○  ⦿

(3) Do you require the prepayment of fees of more than $500 per *client* and for six months or more in advance? ○  ⦿

J. If you are organized as a sole proprietorship, please answer the following: **Yes  No**

(1) (a) Have you passed, on or after January 1, 2000, the Series 65 examination? ○  ○

(b) Have you passed, on or after January 1, 2000, the Series 66 examination and also passed, at any time, the Series 7 examination? ○  ○

(2) (a) Do you have any investment advisory professional designations? ○  ○

*If "no", you do not need to answer Item 2.J(2)(b).*

(b) I have earned and I am in good standing with the organization that issued the following credential:
☐ Certified Financial Planner ("CFP")
☐ Chartered Financial Analyst ("CFA")
☐ Chartered Financial Consultant ("ChFC")
☐ Chartered Investment Counselor ("CIC")
☐ Personal Financial Specialist ("PFS")
☐ None of the above

(3) Your Social Security Number:

K. If you are organized other than as a sole proprietorship, please provide the following:

(1) Indicate the date you obtained your legal status. Date of formation: 07/27/1992

(2) Indicate your IRS Empl. Ident. No.:

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

|  | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ● |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 141211 | MONTICELLO ASSOCIATES, INC. - BROCHURE - 07.14.17 | High net worth individuals, Pension consulting, Foundations/charities |

---

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:
BRENTON G DURHAM

Date: MM/DD/YYYY
04/05/2019

Printed Name:
BRENTON G DURHAM

Title:
PRESIDENT

Adviser *CRD* Number:
107392

---

***NON-RESIDENT* INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents.*

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                          Date: MM/DD/YYYY

Printed Name:                                       Title:

Adviser *CRD* Number:
107392

---

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial application for state registration and all amendments to registration.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the legally designated officers and their successors, of the state in which you maintain your *principal office and place of business* and any other state in which you are applying for registration or amending your registration, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings,* demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding,* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are applying for registration or amending your registration.

## 2. State-Registered Investment Adviser Affidavit

If you are subject to state regulation, by signing this Form ADV, you represent that, you are in compliance with the registration requirements of the state in which you maintain your principal place of business and are in compliance with the bonding, capital, and recordkeeping requirements of that state.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Date: MM/DD/YYYY                                    Printed Name:
04/05/2019                                          BRENTON G DURHAM

Adviser *CRD* Number:
107392

Signature:                                          Title:
BRENTON G DURHAM                                    PRESIDENT

# EXHIBIT F

# Monticello Associates, Inc.

1800 Larimer Street, Suite 2100
Denver, CO  80202
www.monticelloassociates.com
303-572-6300

**Form ADV, Part 2A**
**Brochure**

July 14, 2017

This Brochure provides information about the qualifications and business practices of Monticello Associates, Inc. ("Monticello"), an investment adviser registered with the United States Securities and Exchange Commission (the "SEC").  Registration with the SEC does not imply a certain level of skill or training.  The information in this Brochure has not been approved or verified by the SEC or by any state securities authority.

If you have any questions about the contents of this Brochure, please contact Monticello's Chief Compliance Officer at 303-572-6300.   Additional information about Monticello is also available on the SEC's website at www.adviserinfo.sec.gov.

**Item 2 – Material Changes**

The last update to this Brochure took place on March 27, 2015.   No material changes have occurred since that date.

**Item 3 – Table of Contents**

Item 1 – Cover Page ................................................................................................................ 1

Item 2 – Material Changes ....................................................................................................... 2

Item 3 – Table of Contents ...................................................................................................... 3

Item 4 – Advisory Business ...................................................................................................... 4

Item 5 – Fees and Compensation ............................................................................................ 4

Item 6 – Performance-Based Fees and Side-by-Side Management ......................................... 4

Item 7 – Types of Clients ......................................................................................................... 4

Item 8 – Methods of Analysis, Investment Strategies and Risk of Loss ................................. 4

Item 9 – Disciplinary Information ............................................................................................ 5

Item 10 – Other Financial Industry Activities and Affiliations ............................................... 5

Item 11 – Code of Ethics, Participation or Interest in Client Transactions
               and Personal Trading .............................................................................................. 5

Item 12 – Brokerage Practices ................................................................................................ 6

Item 13 – Review of Accounts ................................................................................................. 6

Item 14 – Client Referrals and Other Compensation.............................................................. 6

Item 15 – Custody ................................................................................................................... 6

Item 16 – Investment Discretion............................................................................................. 6

Item 17 – Voting Client Securities........................................................................................... 6

Item 18 – Financial Information............................................................................................... 7

Item 19 – Requirements for State-Registered Advisers .......................................................... 7

**Item 4 – Advisory Business**

Monticello has been in existence since 1992.  The firm provides to its clients asset management consulting services, which include some or all of the following services:  developing investment policies and objectives, analyzing asset allocation and diversification, researching investment managers for client selection, providing due diligence and performance monitoring of managers, providing periodic performance reports on client accounts, and other related services.

Monticello is principally owned by its President, B. Grady Durham.  The remaining ownership in Monticello is by its Managing Directors.

**Item 5 – Fees and Compensation**

Monticello's only source of income is the consulting fees it charges its clients.  The amount of the consulting fee charged to a client is based on several factors, including the amount of client assets under advisement and the level and complexity of service to be provided to the client.  The consulting fee is an annual-based fee which is payable in quarterly installments, billable in advance at the beginning of each quarter. Monticello does not have a set fee schedule. Monticello's consulting fee does not include investment management fees, transaction costs, or custodial fees that are charged by other service providers.

Monticello's consulting agreement generally does not have a termination date.  Accordingly, either party may terminate the agreement at any time, upon prior written notice.  If an agreement is terminated, Monticello will prorate any pre-paid consulting fees and refund the outstanding amount.

**Item 6 – Performance-Based Fees and Side-by-Side Management**

Neither Monticello nor its employees accept performance-based fees, which are fees based on a share of capital on, or capital appreciation of, the assets of a client.

**Item 7 – Types of Clients**

Monticello provides asset management consulting services to a wide variety of clients, including endowments, foundations, high net-worth families, and retirement plans.

**Item 8 – Methods of Analysis, Investment Strategies and Risk of Loss**

Monticello recommends investment managers to its clients.  These managers offer numerous types of investments, including hedge funds, mutual funds, and private equity funds.   All investments involve the risk of loss that clients should be prepared to bear. Clients should review

the offering documents for the funds offered by the investment managers for further information regarding investment risks.

Monticello evaluates an investment manager based on two main components:   investment merits and operational capabilities.   Monticello's evaluation of investment merits includes both a quantitative and qualitative analysis.   The quantitative analysis includes a review of historical performance, including a review of long and short exposures, use of leverage, investment strategies, asset allocation, volatility, performance in up and down markets, maximum drawdowns, and correlations to capital market indices. The qualitative analysis focuses on overall investment philosophy and the specific ideas of the manager.   Monticello's goal is to discover investment managers with unique, sustainable idea generation that can help portfolios perform in a variety of market environments.

Monticello also reviews certain aspects of a manager's operational capabilities.   For hedge funds, Monticello reviews the following documentation: audited financial statements, due diligence questionnaires, pricing policies, and investment adviser registration forms.    In addition, Monticello may verify a manager's third party service providers, including, as applicable, its prime broker, custodian, auditor, administrator, and legal counsel.

### Item 9 – Disciplinary Information

Monticello is not involved in any legal or disciplinary events that are material to a client's or prospective client's evaluation of Monticello's consulting business.

### Item 10 – Other Financial Industry Activities and Affiliations

Neither Monticello nor its employees is involved in any other financial industry activities or affiliated with any relationship or arrangement that is material to Monticello's consulting business.

### Item 11 – Code of Ethics, Participation or Interest in Client Transactions and Personal Trading

Monticello has adopted a Code of Ethics which sets forth ethical standards of business conduct that the firm requires of its employees.  The Code stresses Monticello's fiduciary obligations to its clients and establishes policies and procedures intended to preclude activities which may lead to or give the appearance of conflicts of interest.

The Code governs personal securities trading activities in the accounts of Monticello's officers, directors, and employees that have access to non-public information regarding a client's purchase or sale of securities (collectively, "Access Persons") and requires that all Access Persons report their personal securities transactions and holdings, as set forth in the Code.

The Code prohibits Access Persons from investing in any securities issued by an investment manager that has been recommended by Monticello to its clients and requires Monticello to disclose the following information to a client before recommending an investment manager to the client: (1) any direct or indirect beneficial ownership by any Access Person or related account in any fund managed by such investment manager, if such ownership is greater than 5% of the fund's total assets; (2) any position by any Access Person with such investment manager; or (3) any business relationship between such investment manager or its affiliates and Monticello.

Clients and prospective clients may obtain a copy of Monticello's Code of Ethics upon request by contacting Monticello's Chief Compliance Officer at 303-572-6300.

**Item 12 – Brokerage Practices**

Monticello does not select or recommend broker-dealers for client transactions or recommend the reasonableness of their compensation.

**Item 13 – Review of Accounts**

Monticello prepares in-depth performance measurement reports for its clients on a quarterly basis, as requested. These reports also include information regarding asset allocation and risk analysis. The reports are presented to clients by Monticello's Investment Consultants.

**Item 14 – Client Referrals and Other Compensation**

Monticello does not receive any economic benefit, other than the consulting fees paid by its clients, for providing consulting services to its clients. Monticello does not directly or indirectly compensate any person who is not an employee of the firm for client referrals.

**Item 15 – Custody**

Monticello does not have custody of client funds or securities.

**Item 16 – Investment Discretion**

Monticello does not accept discretionary authority to manage securities accounts on behalf of clients.

**Item 17 – Voting Client Securities**

Monticello does not accept authority to vote client securities.

**Item 18 – Financial Information**

Monticello has no financial condition that is reasonably likely to impair its ability to meet contractual commitments to clients, and has not been the subject of a bankruptcy petition.

**Item 19 – Requirements for State-Registered Advisers**

Not applicable.

# EXHIBIT G



**William D. Wiese**
(512) 381-8028
bwiese@dbcllp.com
303 Colorado, Suite 2300
Austin, TX 78701
www.dbcllp.com

August 16, 2019

<u>VIA EMAIL (anmarston@hollandhart.com) AND</u>
<u>FIRST CLASS U.S. MAIL</u>

Ms. Amanda N. Marston
Holland & Hart
1800 Broadway, Suite 300
Boulder, Colorado 80302

Re:   *Monticello Associates*

Dear Ms. Marston;

This firm represents Monticello Wealth Management, LLC in connection with its intellectual property matters. Your letter dated August 7, 2019 has been forwarded to us for response. Please direct all future communications regarding this matter to my attention.

As you might imagine, we were surprised to receive your letter, primarily because we do not believe that our client is infringing any rights your client may have in its trademark, but also because it seemed unusually aggressive for a company with no offices in Texas to spend time and money demanding that a company located in San Antonio change a name and logo its used for over nine years, especially when both companies are operating in an industry that is regulated on a state-by-state basis. While we understand your client's need to police its trademark, we believe the demands in your letter exceed the scope of any such obligation. While we don't believe that a protracted trademark dispute would be in either party's interest, we feel compelled to respond to the allegations in your letter so that you understand our client's position on this matter.

First, to infringe your client's rights in its trademark, our client's mark would have to be so similar as to cause confusion among the relevant consuming public. However, a quick side by side comparison reveals two very different trademarks:

     

As you can see, our client's logo includes a number of differences not present in your client's logo, such as four distinct pillars extending underneath a building, a series of three arched windows in a

3035072.1

*Ms. Amanda Marston*
*August 16, 2019*
*Page 2*

row with a fourth window beneath, white lettering on a blue background, a different font, words positioned next to, and not under, the logo, etc. Most importantly, however, is that your client's mark includes the word "Associates" while our client's mark includes the words "Wealth Management." Quite simply, the overall commercial impression of the two marks is entirely different. As a result, it is unreasonable to assert that a consumer of wealth management services would confuse the source of our respective client's services based on any perceived similarities in the two marks.

Second, even if we assume that our client's mark was confusingly similar to your client's mark, we doubt that there would be any likelihood of confusion since, according to the Form ADV filed by your client with the SEC, your client operates exclusively outside of Texas while our client targets consumers exclusively in Texas. Moreover, our client has used its mark in Texas for over nine years without a single instance of confusion with your client's mark. The fact that the two companies have peacefully coexisted for years without any confusion is strong evidence of non-infringement, and there is no evidence to suggest that there will be any confusion in the future.

As an aside, we have questions regarding the ownership of your client's registered trademark. Form ADV identifies your client's business as "Monticello Associates, Inc." while the owner of record of the trademark registration identified in the USPTO's registry is B. Grady Durham, individually. While your letter attempts to obfuscate the fact that Mr. Durham is the owner of the mark his company is using by claiming your client is "B. Grady Durham and his licensee, Monticello Associates" (omitting the "Inc."), it's unusual for a firm of your client's size to license its trademark from an individual rather than own its name outright.

Third, there are a number of other companies using the word "Monticello" in connection with financial services and, as a result, your client's mark is entitled only to weak protection. A cursory Internet search uncovered at least the following examples:

| Company | URL |
|---|---|
| Monticello Consulting Group | https://www.monticellocg.com/financial-services-industry |
| Monticello Banking Company | https://www.mbcbank.com/ |
| Monticello Finance | https://www.yelp.com/biz/monticello-finance-monticello |

As you know, third party usage of similar marks in connection with similar services is strong evidence that the mark is relatively weak and entitled only to the narrowest scope of protection. The greater the number of identical or more or less similar trademarks already in use, the less is the likelihood of confusion. I'm sure that if we searched state registries, common law usages, and other sources of trademarks and trade names, we would find numerous other examples of similar marks, thereby rendering your client's marks even weaker. We believe that, if your client believes it has the

3035072.1

*Ms. Amanda Marston*
*August 16, 2019*
*Page 3*

right to stop our client from using its mark, it will have an uphill battle convincing the owners of each similar mark to also cease their usage.

Fourth, your demand that our client stop using its mark far exceeds any rights your client may have under its federal registration. You are apparently asserting that your client's registration of a logo that includes the words "Monticello Associates" gives it the right to stop our client from using the words "Monticello Wealth Management." However, when determining whether infringement has occurred, each mark must be viewed as a whole and not broken into its component parts. Under the anti-dissection rule, words in composite marks, like your client's, cannot be ignored simply because they are less dominant. It is the impression that the mark as a whole creates on the average reasonably prudent buyer that determines infringement, and not the impression made by any individual word in the mark. Therefore, while your client may have the right to stop others from using the composite mark with a design that includes the words "Monticello Associates" as a whole, that right does not extend to the word "Monticello" when used alone or in combination with a logo.

Fifth, and perhaps most important, even if our client was using a mark that was similar to the mark registered by your client, those registrations do not provide you with an injunctive *remedy* unless and until you demonstrate a likelihood of entry into our client's territory. I'm sure you are aware that, following the holding first adopted in *Dawn Donut Co. v. Hart's Food Stores, Inc.*, while a senior federal registrant may have superior priority, there is no likely confusion for a court to enjoin unless and until the senior user shows a likelihood of entry into the junior user's trade territory. As a result, even if our client's mark was similar to the mark in your client's federal registration, you would not be entitled to enjoin our client's use of its mark unless and until your client demonstrated its intention to enter the Texas market.

In short, we are puzzled as to why your client has decided to spend money demanding that our client stop using a mark that it has used for such a long period when our client's mark is not the same as your client's mark, there is no evidence of actual confusion, and, even if there was a likelihood of confusion, you haven't demonstrated the intent to enter our client's market that would be required to enjoin our client's use of its mark. We trust your client will reconsider its position. If you have information you believe would be relevant to your demands, such as evidence of actual confusion between the two marks or your client's intention to enter the Texas market, I ask that you send it to me so that I can review it with our client. Otherwise, we will consider this matter closed.

Sincerely,

DUBOIS, BRYANT & CAMPBELL, LLP,
A LIMITED LIABILITY PARTNERSHIP

William D. Wiese, Partner

cc:     Client

3035072.1